[Civ. No. 19464. First Dist., Div. One. Apr. 3, 1961.]

FRED A. BAKER et al., Appellants, v. CITY
OF PALO ALTO et al., Respondents.

John A. Sinclair and Ervin S. Best for Appellants.

Robert E. Michalski, City Attorney, and Stanley R. Norton, Assistant City Attorney, for Respondents.

TOBRINER, J.—For the reasons hereinafter stated we believe the trial court properly denied appellants' request for an injunction against the city of Palo Alto and the members of the city council to restrain them from performing a contract for the purchase of land for park purposes and for judgments against the individuals for sums allegedly illegally expended for that purpose. We do not find the city's contract violative of the debt limit provision of article XI, section 18, of the California Constitution. We believe that after the voters, upon referendum, approved the purchase of the land the city properly reexecuted the contract so that it became valid and effective. We cannot agree with appellants that in order to accomplish that end the parties were required to engage in a formal reenactment of the exchanges of consideration. Nor do we find that the court erred in setting aside the submission of the case to permit such reexecution of the contract after the vote on the referendum.

The interest and concern of Palo Alto in the acquisition of a park area in the foothills west of Palo Alto dates from the official expression of the planning commission and the city council in the city's interim general plan of 1955. After various undertakings to locate such property, the city manager in the fall of 1958 reported to the city council that he had found a suitable area. The owners of the property, Dr. and Mrs. Lee, offered it to the city for approximately

$1,000 an acre, the total price amounting to $1,294,000. After viewing the site, obtaining estimates of its value, acquiescing in the price and terms of the purchase, the council on December 8, 1958, formally resolved to approve an agreement for the purchase of the property and authorized the mayor to execute the contract for the city. The city likewise undertook annexation proceedings to bring the park and surrounding area into the city of Palo Alto.

The contract divided the total property into seven parcels; the first, consisting of 600 acres, was to be purchased for $300,000 cash; the balance of the land was to be leased for $1.00 per year for each parcel with the option to purchase each parcel at specified prices on a successive annual basis on or before December 31st of each succeeding year beginning with 1959. In the absence of the execution of any option upon schedule all succeeding options terminated. Nor could the city sell any of the acquired property prior to the earlier of the following dates: (1) seven years subsequent to the date of execution of the contract, or (2) the date of acquisition of all of the property. As to the six parcels, the contract provided that the city could lease and sublease them, that it could make improvements upon the parcels if it so desired and that it could remove such improvements in the event the lease were terminated as to any parcel. The contract did not provide that the sellers would be entitled to repurchase or otherwise recapture any of the property if the city failed to exercise the options; it contained no provision for forfeiture by the city of any funds expended to buy or improve the property.

The contract provided that the purchase of the first parcel be completed by December 31, 1958. On December 8 and 9, 1958, the parties executed the contract, the mayor signing for the city. The city paid $300,000 to the owners and took possession of the 600 acres.

On January 23, 1959, appellants, on the ground that the agreement violated the state Constitution and the city charter, filed a complaint seeking an injunction restraining the performance of the contract and demanding the return of sums expended. Respondents answered, alleging that the entire matter would be submitted to the voters on May 12, 1959. The trial court in the first proceedings granted respondents' motion to abate, suspending proceedings until after the election and finding that "if the resolution is upheld and approved,

it will become fully effective . . . and will amount to a ratification of all actions previously taken thereunder'' and that ''even though the election should not itself be a ratification, ratification by the council of all actions previously taken under the resolution and contract would be fully effective.'' The court left open the question of the legality of the contract under the debt limit provisions.

The voters upon referendum approved the resolution by an affirmative vote of 6648 to a negative vote of 4041. Following the election the council passed Resolution Number 3109 ratifying and confirming the execution of the contract by the mayor and all other actions taken pursuant to the resolution of December 8, 1958.

In the legal proceedings after the election the parties stipulated that the court should consider all questions as though no earlier judgment had been rendered. Subsequent to the trial the court in a memorandum opinion rejected appellants' contentions that the contract violated the debt limit provision and that the purchase did not fulfill a municipal purpose, but held that the execution of the contract was invalid because it occurred before the resolution of purchase became effective and that therefore the subsequent referendum did not automatically ratify it. The court suggested that the parties ''explore the doctrine of adoption of a contract by subsequent action'' and set aside submission of the case to take evidence on that theory.

Subsequently, on December 28, 1959, the Lees and the city reexecuted the contract changing only the dates of execution and notaries. The court concluded that the city could properly reexecute the contract and thereby reaffirm the actions performed pursuant to it; the court rendered judgment for the respondents.

We separately analyze each of the four issues which appellants have tendered as the bases of this appeal.

1. *The executed contract did not violate the debt limit provision of article XI, section 18, of the California Constitution.*

Despite appellants' contrary contention, the contract between the city and the Lees does not constitute an installment contract for the purchase of land for the total price of $1,294,000 in violation of section 18, article XI, of the state Constitution. That section of the Constitution provides in part: ''No . . . city . . . shall incur any indebtedness or liability in any manner or for any purpose exceeding in any year the income and revenue provided for such year,

without the assent of two-thirds of the qualified electors thereof, voting at an election to be held for that purpose. . . ." Admitting that the city possessed the requisite $300,000 for the purchase of the 600 acres and that this provision in itself does not violate the Constitution, appellants contend that the city incurred a liability for the total amount, which does exceed its income and revenue for the year of the execution of the contract. We shall point out that appellants' contention fails in view of the rulings of the Supreme Court and that their own citations are distinguishable. Their further arguments that the nominal annual rental is a fictitious payment; that the economic compulsions created by the contract force a purchase of the total acreage, and that the contract contemplates land speculation rather than park development, are equally unavailing.

The Supreme Court in *California Pac. Title & Trust Co.* v. *Boyle* (1930), 209 Cal. 398 [287 P. 968], disposes of appellants' basic thesis. We set out the excellent discussion of Judge Marshall S. Hall of the trial court regarding *Boyle* and its relation to the instant case: "There the City and County of San Francisco had proposed by a resolution of its Board of Supervisors to acquire 550 acres of land for the establishment of a public park to be popularly known as McLaren Park at a total cost of $2,000,000. The resolution provided that eminent domain proceedings should be undertaken to acquire the necessary land. Also a bond election was held to finance the purchase. It failed to secure approval of the voters. Eminent domain proceedings were never started. However, the City did apparently, in pursuance of its resolution, begin on an annual basis to purchase various individual parcels of land in the area of the planned park. The cost of these several annual purchases was budgeted and set aside for that purpose in each of several fiscal years. Since the operation was apparently a part of an overall plan, which according to the Supervisors' resolution would have a total cost of $2,000,000, it was contended by the objectors that the transaction taken as a whole was violative of Article XI, Section 18, and that each individual purchase was, therefore illegal."

The trial court thus analyzes the Supreme Court decision: ". . . the Supreme Court found that there was no violation of the Constitution and, on that behalf at p. 404 said: '. . . it seems clear to us that the city and county of San Francisco has not exceeded its income or revenue for any one year by

purchase of individual parcels of land for a public purpose for a sum within the income and revenue of that year, even though it is the intent to ultimately acquire a large tract, the purchase price of which, *in toto,* would exceed the yearly income or revenue for any one year.' The Court made the following further observation [p. 407] : 'There is no obligation to buy any other land. The city owns the land purchased, absolutely, and has the complete usufruct thereof. No objection would be made to such a purchase if it were not for the fact that it appears to be the intention of the city to purchase an entire tract over a period of years. Each year the city gets the full consideration for that year's expenditures. In the event they do not purchase the additional land, the amount invested in the other parcels is not lost, for the city retains the land which it has purchased.' "

Judge Hall then describes the analogy of *Boyle* and the instant case : "The facts in the case last cited are strikingly similar to those in the case at bar. In that case the Board of Supervisors of San Francisco had, by its resolution, indicated a plan to establish McLaren Park. It implemented that plan by a series of contracts to purchase individual parcels. In the case before the Court, the City of Palo Alto evidenced an intention to establish an extensive park when it approved the report of its Planning Commission relative to that subject. It implemented its park plan, not by a series of individual contracts but rather by a single contract. It appears that a fair interpretation of that contract and its option provisions bring it squarely within the rule of the San Francisco case.

"Under the instant contract, the City of Palo Alto had complete freedom to complete the purchase of the entire tract piece-meal on an annual basis or to terminate execution of the plan in any given year merely by failure to exercise succeeding options. The City would receive fee title to each parcel purchased and would have complete usufruct thereof. There was no obligation to buy any other land, and the present or a succeeding Council could terminate the program in any year. The contract provided for no forfeiture of any money invested, and it clearly provided that the City would have a right to remove any improvements placed on any portions of the tract that were under lease in the event that the options were not exercised. It has been argued by plaintiffs that the land purchased—namely, 600 acres—was of little value without the acquisition of the whole. Evidence to support that argument is wholly lacking."

Appellants cite four cases for the proposition that the involved contract was "an installment purchase contract" and therefore in violation of the debt limitation mandate, but the cases, we think, do not sustain their proposition.

The first cited case, *Mahoney* v. *City & County of San Francisco* (1927), 201 Cal. 248 [257 P. 49], involved two leases between the city and county of San Francisco and the Spring Valley Water Company, one of which provided for the proposed construction of a playground and park, including a wading and swimming pool upon the "leased" area. The contract provided that the city and county could purchase the property for $240,000 less any rental payments, at any point during the term of the agreement. Despite the denomination of the contract as a "lease" and the designation of the parties as "lessor and lessee," the court concluded that the contract was " 'in its very nature and purpose nothing more than a contract of purchase and sale whereby the city and county by payments which are denominated in the agreement as "annual installments of rentals" actually has contracted to purchase the property through the payment of installments running over a period of ten years.' " (P. 259.)

In *In re City & County of San Francisco* (1925), 195 Cal. 426 [233 P. 965], the next case cited by appellants, San Francisco, in order to acquire Marina property for an exhibition building, likewise, entered into a contract in the terminology of a leasehold which in fact constituted a conditional sale of the premises. The contract provided for no fixed rental; the "lessor" derived nothing from the payments during the term of the agreement. Correspondingly, the contract provided that the principal advantage to the "lessee," the usufruct of the premises, including the annual income, be applied to the eventual purchase price, or, if not purchased, lost. The court held the contract to be "nothing more nor less than an agreement for the conditional sale of the premises described within it to the municipality for public uses in accordance with the terms and conditions which said agreement contains." (P. 435.)

Appellants' third case, *Garrett* v. *Swanton* (1932), 216 Cal. 220 [13 P.2d 725], involved a conditional sales contract providing for the purchase and acquisition of a pumping plant by the city by means of payments over a 60-month period. The title remained in the seller until the completion of the payments. The total amount of the installments exceeded the annual income. Holding the contract no more than a

forbidden installment transaction, the court said: "The law is well settled in this state that installment contracts of any kind . . ., where each installment is not in payment of the consideration furnished that year, and the total amount of said installments when coupled with the other expenditures exceeds the yearly income, are violative of the constitutional provision in question unless approved by a popular vote." (P. 226.)

Appellants' final case, *Rideout* v. *Eich* (1929), 100 Cal. App. 135 [280 P. 140], resting upon the premises of the prior decisions, holds that a compromise agreement of a county board of supervisors as to the balance remaining unpaid on a previous invalid agreement for lease and purchase of a piece of real estate did not validate the original unlawful contract. In effect, the bifurcation of the contract into the past illegal commitment and the current lawful one could not avoid the prohibition against indebtedness in excess of income.

We turn from the distinguishable cases of appellants to their contention that the contractual provision for the dollar per year rental was a fictitious payment. We quote the language of the trial court: "As has been said, it must be assumed that the City would get what it pays for as to each individual parcel, including the complete use thereof. If in addition, the land owner is willing to let the City have the use of all the remaining land at a rental of a dollar per parcel per year, perhaps in the hope that the options would be exercised, that factor of itself would seem to be an additional benefit for receipt of which taxpayers could hardly be heard to complain."

Appellants' argument that the contractual prohibition of sale of the property for seven years or until the exercise of the last option forces the purchase of the whole acreage is likewise analyzed by the trial court: "It is their [appellants'] contention that this provision diminishes the value of the property; that it is an implied lever to cause the purchase of the whole; that thus in effect the City did assume obligation for the total purchase price on the date of the contract. The Court cannot accept that argument. Again, there is no evidence to indicate that these lands are of declining value or that the limitation would otherwise depreciate the value of the property already acquired. If the Court were permitted to engage in speculation, it might be assumed in view of current trends that the property would be of greater value after seven years than it is now."

Appellants' final contention that the city intended real estate speculation rather than park development meets this answer of the trial court: "If speculation were the plan, then indeed it would be a foolish speculator who would purchase property under contract forbidding ready resale. Taken as a whole, this Court is of the view that there is nothing in the instant contract including the provision just discussed which, as the Courts have said, gives rise to 'an increasing compulsion' upon the City to consummate the purchase of the total acreage. In the Court's view, this contract did not at its inception create an immediate obligation in the sum of $1,294,000. The Court feels compelled to place it in the same category as the situation construed in the McLaren Park case. Therefore, the Court will find that the contract is not in violation of Article XI, Section 18 of the Constitution."

In the instant case the city bought 600 acres outright; no forfeiture resulted if future options were not exercised. Each parcel would be of use to the city; the whole area was not essential. The rental was not to be applied to the purchase price as in *Mahoney*. The restraint on transfer for seven years or until all the parcels were acquired did not compel the purchase since in either case no transfer could be effected for at least six years. The present agreement did not constitute an installment contract to which the city became committed; it did not violate the constitutional provision as to debt limitation.

In view of the modern need and desirability of planning for recreational facilities over a number of years, we should not strain to construe a contract, properly limited on an annual basis to meet the debt limitation, as inherently a single obligation stretched over the whole span. Modern complex community living increasingly calls for long-term planning for recreational facilities. Such programs may cover many years; yet the actual expenditures, as here, may be optional undertakings of any single year. We should not weld the separate optional segments of the future into a single block of present obligation unless the language of the instrument compels it; to do so, otherwise, is to create legal obstacles to needed community planning for the future. By a curious merger of tomorrow's unassumed optional undertakings in this contract with today's accepted obligations, appellants actually would prevent the municipality from facing and

meeting tomorrow's needs; this would be a twisted negation of the community's opportunity and obligation to meet its responsibilities.

2. *The municipality sought the involved land for a municipal purpose.*

██ We concur with the trial court that appellants' contention that the city, in violation of the general rule that a municipality cannot engage in property activities outside its borders, bought the property for speculative rather than park purposes, was "unsupported by the evidence." That a municipality cannot acquire extraterritorial property except for municipal purposes is recognized by the authorities (10 McQuillin, Municipal Corporations, 3d ed., § 28.05, p. 10), as well as by the parties. By the same token the parties agree that the city could purchase the land for park purposes. The issue before us narrows to the sufficiency of the evidence to show that the purchase was consummated for the avowed reasons.

The record sustains the proposition that the city did acquire the land for park purposes. The testimony of various members of the city council indicated that in the fall of 1958 that body discussed the purchase of the land for a park. The minutes of the council meetings of October 13, 1958, November 24, 1958, and December 8, 1958, exhibit the same intent. Nor does the fact that the minutes contain indications of a realization that, if part of the property were not required for park usages, that portion might be released for residential development, destroy the primary and lawful purpose of the council. The propriety of acquiring in certain instances land in excess of that specifically needed for the public purpose finds sanction in Government Code, section 192, which states that acts authorizing cities to acquire lands "for the purposes of establishing . . . public places, shall be construed as including among its purposes the acquisition of land in excess of the land actually needed or used for public purposes." The court therefore properly concluded that the evidence sufficiently showed the city's intent to purchase the land for municipal purposes.

3. *Appellants' argument that the contract was void for failure to comply with the referendum provisions of the city charter need not be resolved.*

Respondents present a two-pronged answer to appellants' contention of the voidness of the contract: First, the resolution

involved an administrative rather than a legislative act and therefore was not subject to referendum; second, even if the resolution were thus subject to referendum, the "subsequent ratification" by the council after the completion of the referendum effectuated the validity of the contract. In substance respondents contend that the successful outcome of the referendum served to ratify the contract even if it were not, pursuant to article VI, section 3, of the charter, "effective during" the 30-day "period during which the same is subject to referendum." Respondents urge, too, that this affirmation escapes the charter provision that "[n]o ordinance or resolution subject to a referendum shall go into effect before thirty (30) days after its final passage by the council." As we have pointed out, the parties, upon the suggestion of the court, reexecuted the contract after the completion of the referendum. If the reexecution of the contract were effective, the instant question of unilateral ratification by the referendum becomes moot. If we hold the execution, *post* referendum, sufficient in itself we need not probe further. We therefore turn to the subject of the reexecution of the contract.

4. *Assuming the original contract was void, a new contract could be executed, and the parties thereby could ratify the acts performed pursuant to the original agreement.*

 This issue divides into one of procedure and one of substance; we first turn to the manner in which the trial court initiated the presentation of the issue. After submission of the case, the trial judge wrote to the city's attorney, sending copies to appellants' attorneys, suggesting that they explore the "doctrine of adoption." Thereafter the court set aside submission of the case in order to hear both parties on that subject; at the subsequent hearing respondents offered in evidence a reexecuted copy of the contract. With permission of the court respondents filed a supplemental answer alleging such reexecution. The court then rendered judgment for respondents. Appellants charge that the trial court abused its discretion in setting aside the submission in order to allow respondents to submit new evidence on a theory conceived by the court.

A court is not caught in the legal strait jacket of a particular legal theory and unable to permit a party to present evidence upon another theory which supports his case. As the court said in *Sand* v. *Concrete Service Co.* (1959), 176 Cal.App.2d 169 [1 Cal.Rptr. 257], wherein the trial court set aside its

findings and judgment and permitted the parties to introduce evidence on a theory not originally submitted, "If he [the court] reaches the conclusion from the evidence that an attorney for one party has misconceived the basic rights of his client under the facts which he finds to be true he has not only the right, but the duty, to decide the case in accordance with such findings. All that fairness requires is that the new theory, which the judge decides is the correct one, be disclosed to the opposing party so that he may have a full opportunity to meet it." (P. 172.) Following *Sand*, the court in *Welsh* v. *Griffin* (1960), 179 Cal.App.2d 207 [3 Cal.Rptr. 729], rejected appellant's complaint that the trial court "decided the case on theories not raised by the pleadings." (P. 213.)

The cases cited by appellants do not support their contention. *Giomi* v. *Viotti* (1956), 144 Cal.App.2d 714, 718 [301 P.2d 597]; *Gluskin* v. *Lehrfeld* (1955), 134 Cal.App.2d 804, 810 [286 P.2d 457]; and *Pocock* v. *Deniz* (1955), 134 Cal.App. 2d 758, 761 [286 P.2d 466], hold only that a motion to reopen is in the discretion of the trial judge. *Gluskin* v. *Lehrfeld, supra,* 134 Cal.App.2d 804, stated that a trial court "may properly refuse to reopen a case for the introduction of additional evidence when there is no showing of any excuse for not having produced it at the trial or of due diligence; where the evidence, if received, cannot produce a different result, as where the proposed evidence is merely cumulative; or where no issue was raised by the pleadings to which the offered evidence is relevant." (P. 810.) *Sanborn* v. *Pacific Mut. Life Ins. Co.* (1940), 42 Cal.App.2d 99, 106 [108 P.2d 458], concludes that a party cannot change his theory *on appeal.* In *Hall* v. *Hickey* (1957), 156 Cal.App.2d 94, 99-100 [319 P.2d 33], the court found that the trial judge erred in reopening a case to consider evidence relating to an issue eliminated by demurrer and as to which defendants had no opportunity to answer. Likewise, the appellate court found error in *Mayer* v. *Beondo* (1948), 83 Cal.App.2d 665, 668 [189 P.2d 327, 190 P.2d 23], because the court reopened the case to consider evidence not responsive to the allegations in the pleadings and issued a finding outside the issues.

Certainly the court here correctly permitted a full presentation of the relevant facts, whether adduced before or after submission; the court was not bound by any immutable formality as to the chronology of exposition.

Appellants' foray into formalism does not end with their attack upon the procedure of the court; they also argue

that the "void" contract could not be reexecuted and the acts under it adopted; the parties, if they could, should have performed these acts over again. Indeed, they argue, these matters could not be reenacted because the requisite dates of performance had passed.

We do not see the need for the ritual of reperformance. Upon the removal of the city's disability by the vote of the referendum, the city had full power to enter into the contract. Surely the city, then, could exercise its general right to acquire the property, for such consideration, as of the date and upon the conditions it saw fit. ■■■ "The authority to acquire property for a particular use ordinarily carries with it the right to agree upon the consideration and conditions of the conveyance." (*East Chicago Co.* v. *City of East Chicago* (1909), 171 Ind. 654, 658-659 [87 N.E. 17].) (See also 10 McQuillin, Municipal Corporations, § 28.07, p. 16.) ■■■ The city could, like any other party, retroactively adopt prior acts or fix retroactive dates of execution of the contract. (*Acton Rock Co.* v. *Lone Pine Util. Co.* (1919), 44 Cal.App. 597, 601 [186 P. 809].) ■■■ The city and the Lees did mutually reexecute the contract; they indicated their intent to be bound by the agreement and to affirm all previous steps taken in its performance. The parties bilaterally adopted the transaction articulated in the contract. They could have done so immediately after the city was empowered to act by the referendum; they could have done so after the judgment of the trial court; the trial court in adjudicating a complaint for an injunction could properly refuse such requested relief in the face of these realities. To require the parties to perform again the acts taken under the contract would be to call for idle and empty ceremonies.

We find instances in which courts have sanctioned the reexecution and adoption of ineffective contracts previously consummated. For example, a preincorporation agreement executed on behalf of a corporation not yet formed may be enforced by and against the corporation after its organization where "the evidence discloses that defendant . . . corporation adopted and ratified the contract. . . ." (*El Rio Oils, Ltd.* v. *Pacific Coast Asphalt Co.* (1949), 95 Cal.App.2d 186, 193 [213 P.2d 1].) With respect to a stock subscription agreement, the court in *Robbins* v. *Pacific Eastern Corp.* (1937), 8 Cal.2d 241 [65 P.2d 42], stated: "Contracts which are illegal only because of the place or time of their making may be later adopted at places or times when or where they are not unlaw-

ful." (P. 278.) The court further stated, quoting from *Moore* v. *Moffatt* (1922), 188 Cal. 1, 6 [204 P. 220] : " 'That is to say, the conduct of the parties to the transaction, the defendants on the one hand and the corporation on the other, with reference to the subject matter of the agreement, at a time when the only legal obstacle to the making of a valid subscription agreement had been overcome by compliance with the statutory requirement, was tantamount to an adoption by them of the terms and conditions of the subscription agreement as of the date of its ultimate acceptance, thereby in effect making it finally effectual as the expression of a new agreement, even though in its original making it may have been void and ineffectual for any purpose.' " (Pp. 282-283.)

In conclusion, we believe that appellants' argument is no more than a composition in formalities. Because the contract did not meet the prerequisites in the first instance appellants tell us that it cannot be reexecuted after the prerequisites have been satisfied. According to them, the parties must start from the beginning and the formal exchanges of consideration must again take place. Yet in another connection appellants themselves say, "Our Courts have never hesitated to strip disguise from a document so that it will stand before the world in its true form. . . ." If appearance is not to obscure reality, we must conclude that insistence upon a ritual here should not frustrate the performance of a contract, in its "true form" and substance, for the realization of its beneficial public purposes.

We affirm the judgment.

Bray, P. J., and Duniway, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied May 31, 1961.