[No. A054238. First Dist., Div. Five. Apr. 16, 1993.]

COIT DRAPERY CLEANERS, INC., et al., Plaintiffs and Appellants, v. SEQUOIA INSURANCE COMPANY, Defendant and Respondent; LINDA J. SEAHORN, Intervener and Appellant.

1596

COUNSEL

Branson, Fitzgerald & Howard, Dwight S. Haldan and Sterling Tao for Plaintiffs and Appellants.

Farbstein & Blackman, Donald F. Farbstein, Quackenbush & Quackenbush and William C. Quackenbush for Intervener and Appellant.

Dryden, Margoles, Schimaneck, Hartman & Kelly, Frank Kelly, J. Ryan Roe, Marer, Marer & Schuck, Gerald Z. Marer and John F. Schuck for Defendant and Respondent.

OPINION

PETERSON, P. J.—The trial court ruled that appellants could not shift to an insurer the costs of defending and settling a claim for sexual harassment, since the incidents of sexual harassment in issue here constituted intentional acts, for which coverage would be barred by language in the policy and by Insurance Code section 533. We agree with this conclusion and affirm.

I. FACTS AND PROCEDURAL HISTORY

We summarize the claims and evidence before the trial court as follows.

A. *Sexual Harassment*

During 1987, Linda J. Seahorn, who was about 28 at the time, interviewed for a telephone dispatcher and management trainee position at Coit Drapery Cleaners, Inc. She was interviewed by Dr. Louis J. Kearn, who had founded the company more than 40 years ago and was its president, a major stockholder, and chairman of the board of directors.

Kearn relished his reputation around the company as "a dirty old man." The evidence disclosed Kearn had a long history of sexually harassing young women employees, which was "common knowledge" at Coit. "[A]ny female employee who wanted to remain in Coit's employment, and particularly if she wanted to advance, . . . had to make herself available in some way to Lou Kearn. [¶] . . . [¶] Lou was very free to put his hands on the female employees." He invited female employees to share his bedroom on trips to Mexico, made sexual advances to female employees in his office, sexually fondled and groped female employees on the job, and offered to pay female employees thousands of dollars from corporate funds for sex. There was also

evidence that Coit employees, including Dr. Kearn, jokingly referred to the corporate name Coit as short for "coitus."

If a female employee did not accede to Kearn's demands, she would be fired.

When Seahorn was interviewed by Kearn, he did not dwell upon her qualifications for the job or other business-related inquiries. Instead, he followed his usual practice in interviewing women applicants, by inquiring as to her attitudes toward sex, telling her that he took business trips with female employees and stayed in the same hotel room with them, asked if she had a boyfriend or was unattached, and inquired whether she would be willing to go to bed with prospective clients.

When Seahorn asked another Coit management employee, Sandra Park, whether such highly personal inquiries were "normal," Park told Seahorn not to " 'worry' " about Kearn, that he was " 'just a dirty old man.' " Park told Seahorn that Kearn, despite his sexual insinuations, was harmless. Although Seahorn felt Kearn's behavior in the interview was bizarre and upsetting, she very much needed the job and felt she could handle the situation for the 90 days she would be in Coit's California offices, near Kearn, before her promised position as a Coit manager in Chicago came through.

Seahorn testified Kearn made numerous unwelcome advances and propositions to her during the approximately two months she worked for Coit, before she was terminated for rejecting his advances. He tried to involve her in a game of strip poker, asked about her underwear, and tried to get her into a hot tub—with the aid of Park, who acted as Kearn's procuress in these efforts, and suggested to Seahorn that she should have sex with Kearn.

On one occasion, Kearn invited Seahorn into his private office during business hours—which was strange since there was no business reason requiring the president of the company to confer with a telephone dispatcher, who was separated from him by intermediate supervisors. Kearn asked Seahorn to pour him a drink, and she did so. He asked her to give him a hug, and she gave him a nonpassionate hug. He asked for a passionate hug, and squeezed her tighter. He then pulled her into his office bathroom, put her hand inside his pants on his penis, and put his hand under her skirt and panties. He tried to push her down to the carpeted floor and demanded sex; but Seahorn resisted, pulled away, and left the office. Seahorn was afraid she would lose her job since she did not comply with Kearn's sexual demands.

Shortly thereafter, Kearn had Seahorn fired under the pretext of a reduction in force due to adverse economic conditions. However, the economic

conditions in question had been the same two months previously when Seahorn was hired. Thereafter, Kearn called Seahorn on numerous occasions, offered her money, and tried to keep her quiet and away from lawyers.

Kearn's sexual harassment and termination of Seahorn caused her to suffer lost wages and serious psychiatric problems, including depression, chemical dependency, and suicidal thoughts.

### B. *Seahorn's Lawsuit and Its Tender to an Insurer*

Seahorn brought an action against Coit, Kearn, and Park, alleging theories of sexual harassment in violation of Government Code section 12940 et seq., invasion of privacy, wrongful termination, breach of public policy, infliction of emotional distress, fraud, and battery, with demands for punitive damages.

Several months later, Coit sought to tender defense of the Seahorn lawsuit to its insurer, respondent Sequoia Insurance Company, which had in force a policy of general liability coverage for Coit's dry cleaning business.

Sequoia referred the matter to its counsel for investigation and, on the advice of counsel, declined to accept the tender of the defense. Sequoia relied on the fact that, inter alia, the claimed sexual harassment and wrongful termination of Seahorn could not constitute an "occurrence" under its policy, since these events were expected or intended by the insured.

In March 1990, the action was settled by Seahorn and the defendants, without the participation of Sequoia, for slightly more than $1 million. The settlement agreement contains a number of rather unusual features designed to force respondent insurer Sequoia to pay the bulk of the settlement, despite its refusal to admit coverage for intentional acts of sexual harassment and wrongful termination. For instance, the total amount of the settlement was $1,055,000 ($750,000 plus costs and attorney fees of $305,000) of which Coit was to ultimately pay only $350,000, with nothing contributed by Kearn or Park, who were allegedly the actual wrongdoers. The settling parties agreed among themselves that Sequoia would have to pay the almost two-thirds of the settlement which was remaining—$705,000. Seahorn made an uncontested motion to determine that this settlement was in "good faith," and the trial court granted the unopposed motion. No judgment of dismissal was ever filed, so technically the Seahorn action is still pending.

### C. *Suit Against the Insurer*

Coit, Kearn, and Park then filed this action against respondent insurer Sequoia, alleging breach of contract and of the covenant of good faith and

fair dealing for Sequoia's refusal to defend or indemnify against Seahorn's sexual harassment and wrongful termination claims under its general liability policy.

The parties stipulated that the initial legal issue of Sequoia's duty to defend, if any, would be tried to the court. The trial court reviewed documentary evidence and initially indicated in an oral statement that the acts of Kearn and Park were intentional and, therefore, not occurrences under the policy, but that Coit, as a corporate entity, could be covered since it never authorized its employees to engage in sexual harassment; further, there would "probably" be a duty to defend the Seahorn lawsuit based upon a possible claim of defamation—which claim was not made in Seahorn's complaint, but which might have arisen from the facts alleged.

The trial then continued before the jury as to damages. However, during the jury trial, the court partially reversed its earlier oral ruling on the legal issue of the duty to defend, and ruled that there was no legal duty to defend because the acts of sexual harassment were intentional and willful misconduct by high managing agents of Coit. Therefore, since there was no legal duty to defend, there could be no duty to indemnify for damages; and the trial court granted Sequoia's motion for a directed verdict, on that basis, as to the matters which would have been tried to the jury. Appellants Coit, Kearn, Park, and Seahorn (who had intervened in the proceedings) brought timely appeals from the judgment.

## II. DISCUSSION

We affirm the trial court's ruling that the acts of sexual harassment and wrongful termination claimed here were intentional acts, for which coverage was excluded by the language of the relevant insurance policy and by Insurance Code section 533 (section 533).[1] Review of the allegations made by Seahorn, and the evidence presented to the trial court concerning the sexual harassment and employment termination in issue here, shows no credible argument that this alleged wrongful conduct could be anything other than intentional and willful. One does not, for instance, try to force an unwilling subordinate employee to the floor for intercourse, or fire her for refusing sexual favors, as a result of mere negligence.

---

[1]The relevant policy exclusion states, "This insurance does not apply to: [¶] a. 'Bodily injury' or 'property damage' *expected or intended* from the standpoint of the insured." (Italics added.)

Section 533 provides: "An insurer is not liable for a loss caused by the wilful act of the insured; but [the insurer] is not exonerated by the negligence of the insured, or of the insured's agents or others."

## A. *Section 533 Bars Coverage for Sexual Harassment*

 California law and applicable precedents do not allow the recharacterization of such clearly intentional and willful sexual misconduct as merely negligent or nonwillful, so as to trigger insurance coverage. In the lead case of *J. C. Penney Casualty Ins. Co.* v. *M. K.* (1991) 52 Cal.3d 1009, 1020-1021 [278 Cal.Rptr. 64, 804 P.2d 689], our Supreme Court clarified the applicable legal principles by holding that section 533 bars recovery on an insurance policy for the "wilful act" of sexually molesting a child. In *Fire Ins. Exchange* v. *Altieri* (1991) 235 Cal.App.3d 1352, 1359-1360 [1 Cal.Rptr.2d 360], the Sixth District held that section 533 bars insurance recovery for an intentional battery, such as the one Seahorn allegedly suffered as a result of Kearn's attack on her in his office. In *Studley* v. *Benicia Unified Sch. Dist.* (1991) 230 Cal.App.3d 454 [281 Cal.Rptr. 631], Division One of this district held that section 533 bars insurance recovery for the death of a victim during an assault by her estranged boyfriend. In *B & E Convalescent Center* v. *State Compensation Ins. Fund* (1992) 8 Cal.App.4th 78 [9 Cal.Rptr.2d 894], the Second District held that section 533 bars insurance recovery for an employer's willful act in wrongfully discharging an employee.

The same principles apply here. While the parties have not cited, and our own research has not disclosed, any published decisions precisely on point which deal with sexual harassment, it is clear that section 533, and the public policy it represents, bar the attempt to shift liability for intentional sexual harassment and associated employment-related torts (claims of wrongful discharge, infliction of emotional distress, battery, and sexual assault) to an insurer. (See *J. C. Penney Casualty Ins. Co.* v. *M. K.*, *supra*, 52 Cal.3d at pp. 1020-1021.)

As this court (Division Two) noted in the recent case of *California Casualty Management Co.* v. *Martocchio* (1992) 11 Cal.App.4th 1527, 1531 [15 Cal.Rptr.2d 277]: "Section 533 has existed without substantive change in the law of this state since it was codified as Civil Code section 2629 in 1873-1874. [Citations.] It provides: 'An insurer is not liable for a loss caused by the wilful act of the insured; but he [the insurer] is not exonerated by the negligence of the insured, or of the insured's agents or others.'"

 "Section 533 is an implied exclusionary clause statutorily read into all insurance policies. (*J. C. Penney* [*supra*, 52 Cal.3d at p. 1019.]) It is subject to the rules of *statutory* construction, *not* to the rules governing contract interpretation, and must be construed in order to effect its purpose. [Citations.]" (*California Casualty Management Co.* v. *Martocchio*, *supra*, 11 Cal.App.4th at p. 1531, italics in original.)

■ Quite apart from the plain meaning of section 533, and its obvious application to claims of intentional wrongdoing such as those in issue here, the purpose and public policy represented by the section, and the public and statutory policy of this state against sexual harassment of employees, would not be well served by a ruling which would exonerate a perpetrator from payment of damages for his own willful act of sexual gratification, by shifting such liability to an insurer. (See *Bank of the West* v. *Superior Court* (1992) 2 Cal.4th 1254, 1267 [10 Cal.Rptr.2d 538, 833 P.2d 545].) "If insurance coverage were available for monetary awards under the Unfair Business Practices Act, a person found to have violated the act would simply shift the loss to his insurer . . . ." (*Ibid.*)

## B. The Unavailability of Coverage as to Coit

We understand, but reject, the various arguments appellants make in an attempt to secure insurance coverage for these intentional and willful acts of Coit's high managerial agents and policy makers.

### 1. Defamation

■ First, appellants claim coverage might be available, at least to the extent of creating a duty to defend, if a claim for defamation had been made against defendants. However, as the trial court aptly noted, no such claim for defamation was made, nor do the facts alleged in the complaint or put before the trial court support the existence of such a claim. Appellants seem to say only that Coit and the other defendants initially denied the allegations of harassment in statements to investigators of the California Department of Fair Employment and Housing, and that those false denials of sexual harassment might somehow constitute defamation of Seahorn by contradicting her statement such harassment did occur, thus triggering insurance coverage. Such sophistry proves too much. No authorities are cited, and we have found none, to support the position that such denials of one's own conduct are defamation. Adoption of that theory would manufacture coverage and a duty to defend, despite the provisions of section 533, simply because a defendant initially denied wrongdoing in any lawsuit or official administrative investigation. Section 533 may not be rendered inapplicable by such a ruse.

Further, statements made in litigation or an official investigation are privileged (see Civ. Code, § 47), and cannot in any event support a defamation claim which would allow insurance coverage for sexual harassment. (See *Lindsey* v. *Admiral Ins. Co.* (N.D.Cal. 1992) 804 F.Supp. 47, 52 ["For there to be coverage, the . . . complaint must have alleged every necessary element of defamation. [Citation.] . . . The simple fact is that [the] alleged

comments may have given rise to a claim for sexual harassment, but the same allegations do not constitute a claim for defamation."]; cf. also *Hurley Construction Co.* v. *State Farm Fire & Casualty Co.* (1992) 10 Cal.App.4th 533, 538 [12 Cal.Rptr.2d 629] ["[T]he insured may not speculate about unpled third party claims to manufacture coverage."].)

Broadly viewed, this theory of liability for defamation, and an insurer's duty to defend and indemnify therefor, would thus only flow from, and be inseparable from, an intentional and willful act—a willful and knowingly false denial of sexual harassment—for which coverage is legally barred. (See *Houg* v. *State Farm Fire and Cas. Co.* (Minn.App. 1992) 481 N.W.2d 393, 397 [There was no duty to defend a lawsuit alleging similar sexual misconduct by a pastor against one of his parishioners, where the allegation the pastor was merely negligent when he seduced and coerced the parishioner into sex was "so intertwined with [his] sexual exploitation of a psychologically dependent person as to be inseparable."]; accord, *Fire Ins. Exchange* v. *Superior Court* (1993) 12 Cal.App.4th 457, 467 [16 Cal.Rptr.2d 10] [Claims of coverage for sexual misconduct were rejected because the perpetrator's "acts were no less intertwined. His postmolestation acts and statements cannot reasonably be deemed to be accidental. No triable issue of material fact was presented because [the insurer] had no duty to defend . . . ."].) Further, we note that, after the parties to the Seahorn lawsuit did begin to discuss a potential claim for defamation, Sequoia agreed to defend the lawsuit, despite its objections. The Coit defendants refused that offer of a defense, because they had already decided to settle the case. These events do not support a claim of bad faith breach of covenant by an insurer for failure to defend a potential claim of defamation—rather the reverse.

### 2. *Negligence*

Moreover, despite the Coit defendants' latter-day contention that a claim for "negligent supervision" of the sex life of Coit's president and chairman of the board might have somehow been covered, Seahorn never made such a claim in her complaint, and in fact disavowed any such claim. In her counsel's words: "This is not an action involving negligent supervision . . . ." Review of the complaint confirms the truth of this statement: There are, in fact, no allegations at all of negligent supervision.

In addition, of course, the trial court properly found that there was no way Coit, the corporate entity, could have disciplined or supervised its president, chairman of the board, and major shareholder; further, the evidence showed his sexual misconduct with female employees was affirmatively known to, and ratified by, the board of directors and Coit. In fact, the complaint itself

affirmatively alleges such ratification, as well as alleging the managerial agent status of the president. Moreover, any claim for mere negligence by Coit would be barred here by the workers' compensation laws, since Seahorn was the employee of Coit and may not sue for its allegedly negligent or improper supervision. (See *Cole* v. *Fair Oaks Fire Protection Dist.* (1987) 43 Cal.3d 148, 161 [233 Cal.Rptr. 308, 729 P.2d 743].) Coit agrees with the principle that negligence occurring during Seahorn's employment would be barred by workers' compensation exclusivity principles, except for intentional acts of sexual harassment in violation of public policy, uninsurable under section 533, which (unlike employer negligence) are not an expected part of the employment relationship. (See *Gantt* v. *Sentry Insurance* (1992) 1 Cal.4th 1083, 1099-1100 [4 Cal.Rptr.2d 874, 824 P.2d 680].)

Coit, however, also contends that Seahorn might have a potential claim for negligence arising from her sexual harassment during the preemployment interview with Kearn, or in his phone calls to her after her discharge; i.e., negligence not arising during the term of Seahorn's employment and, therefore, not precluded by workers' compensation exclusivity. We note, however, that the exclusivity principle is not necessarily limited to injuries sustained during the narrowly defined period between hiring and discharge. (See, e.g., *Shoemaker* v. *Myers* (1990) 52 Cal.3d 1, 19 [276 Cal.Rptr. 303, 801 P.2d 1054] ["The statutory language, 'arising from and in the course of the employment,' thus manifestly encompasses more than the period during which the contractual employment relationship technically exists."]; *Laeng* v. *Workmen's Comp. Appeals Bd.* (1972) 6 Cal.3d 771, 777-778, 783 [100 Cal.Rptr. 377, 494 P.2d 1] [Workers' compensation laws apply to injuries sustained by job applicants on the employer's premises, where the injuries result from the risks inherent in the employer's actions.].) We need not actually apply exclusivity principles to the sexual harassment allegations in issue here, because those acts of sexual harassment by Kearn were necessarily intentional; they were also ratified and condoned by Coit, as Seahorn alleged.

Moreover, Seahorn's claims of negligent infliction of emotional distress, as alleged in her complaint, refer only to the breach of "a duty of reasonable care with respect to her position, status, and rights *as an employee.*" (Italics added.) More critically, any hypothetical liability for mere negligence could not exist here, but for the intentional acts of Kearn which occurred during the course of Seahorn's employment and were ratified and condoned by Coit.

We emphasize that we are dealing here with a case in which the acts of sexual harassment alleged are, by their very nature, intentional and wrongful; it would be contrary to public policy to allow a wrongdoer which is

directly and strictly liable for such wrongdoing, such as Coit, to shift the loss resulting from such an unlawful corporate practice to its insurer. (See *Bank of the West* v. *Superior Court, supra,* 2 Cal.4th at p. 1267; *B & E Convalescent Center* v. *State Compensation Ins. Fund, supra,* 8 Cal.App.4th at p. 102 ["Any other conclusion would undermine not only the strong policy behind section 533, but also the substantial and firmly established polices embodied in the [antidiscrimination] statutes that were alleged to have been violated."]; *Solo Cup Co.* v. *Federal Ins. Co.* (7th Cir. 1980) 619 F.2d 1178, 1186 ["The policy definition of an insured occurrence would extend only to a liability incurred by reason of [the corporation's] *unintentionally* exposing women to discriminatory conditions. The extent of this coverage is therefore inconsistent with liability predicated on the disparate treatment theory [such as sexual harassment] . . . ." Italics in original.]; *Seminole Point Hosp. Corp.* v. *Aetna Cas. & Sur. Co.* (D.N.H. 1987) 675 F.Supp. 44, 47 [An insurer "must defend and indemnify the corporation for its negligence [in failing to properly supervise], but will not be responsible for the corporation's intentional or discriminatory acts."]; *Worcester Ins.* v. *Fells Acres Day School* (Mass. 1990) 408 Mass. 393 [558 N.E.2d. 958, 969] ["Similarly, if it could be shown that [sexual] abuse at the school was so routine as to constitute a general practice or policy, the abuse could be imputed to [the corporation], even if the abuse was not committed for the benefit of the corporation."].)

Appellants rely for the negligent supervision theory, in pertinent part, upon a decision by Division One of the Fourth District which has recently been ordered not published in the Official Reports. That case has no precedential value; and in any event, no California court has held that a corporation can secure coverage for its own intentional acts of sexual discrimination and harassment, despite section 533. ■ We recognize that the duty to defend is broader than the duty to indemnify, and may extend to a set of circumstances measured only by the objectively reasonable expectations of the insured. (*B & E Convalescent Center* v. *State Compensation Ins. Fund, supra,* 8 Cal.App.4th at pp. 93, 99.) ■ However, we fail to see how any corporation could reasonably expect it would be defended against intentional misconduct claims, where the sexual misconduct in issue was a matter of corporate policy, as here.

Our conclusion as to the duty to defend is consistent with that reached recently by our Supreme Court in *Horace Mann Ins. Co.* v. *Barbara B.* (1993) 4 Cal.4th 1076 [17 Cal.Rptr.2d 210, 846 P.2d 792]. *Horace Mann* dealt with an unusual situation, in which a junior high school band teacher had had apparently nonforcible sexual contact with a 13-year-old student. The student alleged she was harmed by both the teacher's intentional conduct in carrying on his affair with a minor, and by his negligent conduct

in publicly embarrassing her with the fact of the affair, through his inept statements and conduct in front of other students. (*Id.* at p. 1079.) As to the sexual contact with the minor, our Supreme Court held there clearly was no duty to defend. (*Id.* at p. 1083.)

The Supreme Court also recognized that the claimed negligent conduct could lie outside the scope of the duty to defend, if the alleged instances of negligent conduct "occurred in such close temporal and spatial proximity to the molestation as to *compel* the conclusion that they are inseparable from it for purposes of determining whether [the insurer] owed a duty to defend [the insured]." (*Horace Mann Ins. Co.* v. *Barbara B., supra,* 4 Cal.4th at p. 1084, italics in original.) While rather unclear, we take the language "temporal and spatial proximity to the molestation" to mean that certain alleged conduct can be "inseparable" from intentional wrongful conduct and, therefore, not subject to any duty to defend, even where such conduct might have triggered such a duty when standing alone. For instance, if in the course of inseparably intentional sexual molestation or harassment of the victim, the wrongdoer so negligently behaved as to cause the victim additional physical or emotional harm, there is no duty to defend, even though mere negligence not occurring during an inseparable course of intentional conduct might theoretically be covered. (See *ibid.*)

However, as the Supreme Court noted in *Horace Mann,* it was dealing with the case "in somewhat of a factual vacuum." (4 Cal.4th at p. 1084.) There were "unresolved factual disputes" concerning whether certain conduct, which the Court of Appeal and Supreme Court called " 'parasexual' " (hugging, kissing, and dandling the victim in front of other students) was either intentional or inseparable from intentional conduct; therefore, the duty to defend might still exist. (*Id.* at pp. 1083, 1084-1085.) One might question the assumption that a teacher may unintentionally kiss, hug, and fondle a young student with whom the teacher is intentionally having an illicit affair. (See *id.* at p. 1088 (conc. opn. of Baxter, J).) "On this record, that conclusion strains common sense." (*Ibid.*) However, our Supreme Court, dealing with the case in a "vacuum," apparently entertained this as at least a theoretical possibility.

In the present case, of course, the conduct of the defendants was inseparably intentional. It was part of a consistent course of sexual harassment of an unconsenting victim, in an employment setting. All of this conduct was harmful and wrongful, as a matter of law; there are no unresolved factual issues as to the intentionality of Kearn's harassing conduct, as appellants conceded at oral argument. There was no duty to defend. (See *Horace Mann Ins. Co.* v. *Barbara B., supra,* 4 Cal.4th at pp. 1083-1084.)

In the present case, no claim for negligent supervision was made in the complaint and none was supportable by the facts; and the sexual abuse of female employees by Kearn was so widespread, well known, and so ratified by the corporation as to constitute intentional corporate policy, which cannot be the subject of insurance coverage. (*Loyola Marymount University* v. *Hartford Accident & Indemnity Co.* (1990) 219 Cal.App.3d 1217, 1225 [271 Cal.Rptr. 528] [No coverage for damages caused by university's allegedly discriminatory policy of discharging married priests, despite claims that the university might have been merely negligent in failing to comply with federal antidiscrimination laws, because "an intentional discharge or application of an employment policy does not become an accidental occurrence even if it has only an unintended federally prohibited discriminatory effect."]; see also *Chamberlain* v. *Allstate Ins. Co.* (9th Cir. 1991) 931 F.2d 1361, 1363, 1365 [There was no duty to defend claims arising from a 12-year sexual relationship, even though the victim claimed her emotional distress resulted from "negligence" as well as intentional conduct.]; *Hartford Fire Ins. Co.* v. *Karavan Enterprises, Inc.* (N.D.Cal. 1987) 659 F.Supp. 1077, 1080 [Claims of coverage based upon negligent failure to follow proper procedures in discharging an employee were rejected.]; *American Guar. & Liability* v. *Vista Medical Supply* (N.D.Cal. 1988) 699 F.Supp. 787, 792 [No coverage for corporate policy of paying men more than women, and then discriminatorily discharging a female employee, even if the statutory violation, as opposed to the act, was merely negligent: "The act of setting an employment policy is intentional . . . ."].) Here, the trial court found Coit, its managers, and board of directors were well aware of, and ratified and condoned, the sexual harassment of female employees as a way to satisfy Kearn's urges for sexual domination of females. Coit should not receive insurance coverage for the liability it, thus, intentionally created.

For the same reasons, it is unavailing for appellants to suggest Coit was merely negligent in failing to enact and enforce corporate policies against sexual harassment, so as to prevent its president and major shareholder from attacking female employees. Coverage cannot be created by claimed negligence in failing to dissuade oneself from committing an intentional act, otherwise every intentional act would be covered and section 533 would have no meaning. (See *J. C. Penney Casualty Ins. Co.* v. *M. K., supra*, 52 Cal.3d at pp. 1019-1021.) We are required to interpret section 533 so as to give effect and meaning to all its provisions; just as we cannot allow insurers to recharacterize negligent conduct as intentional, we cannot allow the insured to recast intentional conduct as merely negligent. (See *ibid.*)

Appellants also suggest their contentions are aided by *Republic Indemnity Co.* v. *Superior Court* (1990) 224 Cal.App.3d 492 [273 Cal.Rptr. 331], but

their reliance on this case is unwarranted. *Republic* did not deal with *intentional* acts of sexual harassment; rather, it dealt with unintentional acts of discrimination resulting from a failure to accommodate an employee who was sick, and the court only concluded there could be a duty to defend a lawsuit alleging such *nonwillful* conduct. (Pp. 497-498.) Moreover, *Republic* relied in relevant part upon the legal conclusion that the employer did not act with a "preconceived intent to injure" the employee. (Pp. 502-503.) That consideration has since been rejected by our Supreme Court where the acts for which insurance coverage is sought are willful and intentional. (*J. C. Penney Casualty Ins. Co.* v. *M. K.*, *supra*, 52 Cal.3d at p. 1025.)

Although we also believe the acts claimed in the Seahorn lawsuit would not in any event constitute an "occurrence" under the terms of the policy— since they were not unexpected or unintended from the standpoint of the insured, we base our holding more directly upon the statutory mandate of section 533 since, as our Supreme Court held in *J. C. Penney*, *supra*, section 533 forms part of the policy by operation of law, and the parties to an insurance contract cannot in any event agree, intend, or expect to create coverage which violates section 533. (52 Cal.3d at pp. 1019-1020 and fn. 8, p. 1028, fn. 17; cf. also *Lipson* v. *Jordache Enterprises, Inc.* (1992) 9 Cal.App.4th 151, 154, 159 [11 Cal.Rptr.2d 271], review den. [This court (Division Five), per Justice Rouse, held that claims of wrongful termination, "harassment," and "negligence" were not "occurrence[s]" under policy language.].)

### 3. *Procedural Objections by Coit*

■ Although no timely objection was made below, and the point would therefore be deemed waived on appeal, Coit strenuously objects to the rather unusual procedure followed by the trial court in first announcing, but later reconsidering, its ruling on the duty to defend issue.

We review the procedure followed here in order to clarify the issue. Prior to any hearing or trial, the parties stipulated that the issue of the duty to defend would be tried to the court, not the jury. The court, as trier of fact, reviewed documentary evidence and initially concluded, as recited above, that there could be no coverage as to Kearn or Park individually, since their acts were necessarily intentional. However, the trial court also indicated it found a duty to defend Coit, the corporate entity, based upon a claim of defamation which could have been made by Seahorn.

The matter therefore proceeded, on the following day, to a second phase before a jury as to the issue of damages for Sequoia's failure to defend under

the policy. The jury heard live testimony relating to this issue. At the same time, the trial court was apparently mulling over and reconsidering its oral ruling of the previous day on the duty to defend issue, which had not yet been reduced to any formal written order.

The trial court gave due warning of its intentions to Coit and Seahorn, stating that, after hearing certain evidence disclosed in the case being tried to the jury, it doubted the correctness of its prior ruling on the issue of Coit's coverage for unclaimed defamation, since any defamatory conduct of Kearn reflected the intentional acts and policy of Coit. Neither Coit nor Seahorn raised any objection to the trial court's consideration of the evidence adduced in the jury trial as an aid in reconsidering the prior ruling in the court trial; nor did they seek to introduce any other new evidence in response to the trial court's enunciation of its new theory of the case. We agree this may have been an unusual and unorthodox procedure, which should not necessarily serve as a model for future cases, but find no timely objection and no substantial error on these facts.

(7) It is hornbook law that a timely and specific objection is required to prevent the consideration of certain evidence; the failure to object at all waives any claim of error. (See, e.g., *People* v. *Corrigan* (1957) 48 Cal.2d 551, 556 [310 P.2d 953] [The waiver rule also applies when there is no timely objection to the actions of the trial judge in eliciting new evidence.].) ▬ Any error here was waived. (Evid. Code, § 353, subd. (a).)

▬ Further, where a matter is tried to the court as here, the trial judge has broad discretion to reopen the matter prior to final judgment, even over the objection of the litigants. "Within reasonable limits, it is not only the right but the duty of a trial judge to clearly bring out the facts so that the important functions of his office may be fairly and justly performed. [Citations.] For the same reason the trial judge is not to be unduly and unreasonably hampered in his control or conduct of the trial." (*Estate of Dupont* (1943) 60 Cal.App.2d 276, 290 [140 P.2d 866]; accord, People ex rel. *Kottmeier* v. *Municipal Court* (1990) 220 Cal.App.3d 602, 611 [269 Cal.Rptr. 542]; see also *Martin* v. *Martin* (1947) 79 Cal.App.2d 409, 410-411 [179 P.2d 655] [Court sitting without a jury may properly request additional evidence on crucial points.].) As Justice Tobriner held in *Baker* v. *City of Palo Alto* (1961) 190 Cal.App.2d 744, 755-756 [12 Cal.Rptr. 425], the trial court may sometimes even need to vacate a prior formal order on a matter and consider additional new evidence in light of the applicable legal theory. " 'All that fairness requires is that the new theory, which the judge decides is the correct one, be disclosed to the opposing party so that he may

have a full opportunity to meet it.' " (*Id.* at p. 756, quoting *Sand* v. *Concrete Service Co.* (1959) 176 Cal.App.2d 169, 172 [1 Cal.Rptr. 257].) Such a procedure, while admittedly very unusual, does not violate the litigants' rights when adequate notice is given, as here—and may, in fact, be required in order to reach a just result. (*Ibid.*)

 Whether the trial court's conclusion here is viewed as a final formal judgment on the duty-to-defend issue which was tried by stipulation of the parties to the court, as we believe is proper, or as its legal ruling on Sequoia's motion for a directed verdict during the jury trial on liability, the result is the same: The trial court correctly concluded, as a matter of law, that there cannot be insurance coverage for intentional sexual harassment of an employee; and as there was no duty to defend against such allegations, there could be no duty to indemnify. The trial court's legal conclusion is entirely correct. (See *J. C. Penney Casualty Ins. Co.* v. *M. K.*, *supra*, 52 Cal.3d at p. 1028.)

In light of our affirmance of this legal ruling, we need not reach the additional contention of Sequoia that the settlement of the Seahorn lawsuit between Seahorn and the Coit defendants, so as to cause Sequoia to pay all the attorney fees and the bulk of the compensatory damages—while allocating nothing to the wrongful and intentional acts of defendants Kearn and Park, and nothing for their uninsurable punitive damages—was fraudulent and collusive. We note, however, that the evidence amply supported such a conclusion; and as a matter of law, no other conclusion would be possible, on these facts. (Cf. *Wright* v. *Fireman's Fund Ins. Companies* (1992) 11 Cal.App.4th 998, 1024 [14 Cal.Rptr.2d 588] ["To hold otherwise would create in the insured the ability to escape all [personal] liability for his or her own wrongdoing while imposing on the insurer totally unsupported liability. The potential for fraud and collusion is evident."].)

### 4. *The Public Policy Against Sexual Harassment Must Be Harmonized With Section 533*

 In light of the strong public policy against sexual discrimination and harassment in employment, as embodied in Government Code section 12940 et seq.,[2] we seriously question whether section 533 would ever permit insurance coverage for any intentional course of conduct, as evidenced by this record, consisting of a long pattern of behavior of sexual discrimination and sexual harassment by a corporation's high managerial agents which have

---

[2]Government Code section 12940 provides, in pertinent part, "It shall be an unlawful employment practice . . . . [¶] . . . [¶] (h)(1) For an employer, . . . because of . . . sex, . . . to harass an employee . . . ."

been known, ratified, and condoned by the corporation. As Justice Croskey observed in *B & E Convalescent Center*, when considering the public policy against unlawful employment discrimination in light of the mandates of section 533: "Under any reasonable criterion, a termination in violation of such public policies must be held *wrongful as a matter of law*. As we have pointed out, such claim[s] can *only* be established by evidence of an employer's motive and intent to violate and frustrate the law(s) declaring or establishing fundamental public policy. It would be unreasonable, mischievous and improper if section 533, which reflects the 'fundamental public policy of denying coverage for willful wrongs' (*J.C. Penney, supra*, 52 Cal.3d at pp. 1019-1020, fn. 8), were construed in any way other than to deny insurance coverage in the most certain and unambiguous terms for willful and intentional acts that contravene 'fundamental policies that are delineated in constitutional or statutory provisions' (*Gantt, supra*, 1 Cal.4th at p. 1095)." (8 Cal.App.4th at p. 99, italics in original.)

In order to effectuate this public policy, corporate employers have been made liable for the acts of sexual harassment by their managerial agents in the workplace of which the corporation was aware and which it ratified or condoned; theories of negligent supervision are no longer even necessary to establish *corporate* liability for the intentional acts of managerial agents in this context. (See *Fisher* v. *San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 608, fn. 6 [262 Cal.Rptr. 842].)

We are concerned here, however, not with corporate liability but with an insurer's responsibilities to defend and indemnify the corporation it insures when such intentional acts occur under the circumstances of this case. The sexual harassment complained of here occurred in the context of a policy of quid pro quo, where corporate funds, employment, and advancement were used or withheld, as a matter of common knowledge and routine, to coerce sexual favors for a high managerial employee. The corporation here, in allowing, condoning, and ratifying such intentional conduct as a matter of corporate policy, triggered the prohibition against insurance coverage for such intentional wrongful conduct embodied in section 533. ██ Thus, the insurer had no duty to defend.[3]

In words which our Supreme Court applied in denying insurance coverage under section 533 for sexual molestation of a child, and which are equally

---

[3]Appellants tacitly concede insurance coverage for intentional sexual harassment is barred by section 533 and by public policy. However, appellants also note there is no statute or public policy directly forbidding an insurer's provision of a defense to its insured; they suggest an insurer may have a duty to defend, even where there is no possibility of indemnity coverage because the conduct in issue is solely intentional. It is well established, however, that where, as here, both statute and public policy bar any possibility of indemnity for conduct which is inseparably intentional, there is also no duty to defend. Otherwise, an insurer would have a duty to defend actions alleging only intentional wrongful conduct outside the scope of

applicable to the actions of the insured corporation in the sexual harassment in issue here: "Section 533 precludes coverage in this case because [the wrongful act] is *always* intentional, it is *always* wrongful, and it is *always* harmful." (*J. C. Penney Casualty Ins. Co.* v. *M. K., supra,* 52 Cal.3d at p. 1025, emphasis in original.)

III. DISPOSITION

The judgment of dismissal is affirmed. Costs are awarded to Sequoia.

King, J., and Haning, J., concurred.

Petitions for a rehearing were denied May 12, 1993, and the petition of all appellants for review by the Supreme Court was denied July 29, 1993.

---

any potential for coverage provided by the insurance policy itself or permitted by statute. This case involves only "sexual misconduct outside the policy coverage under the rule of *J. C. Penney, supra,* 52 Cal.3d 1009, and thus [is] outside of any duty to defend." (*Horace Mann Ins. Co.* v. *Barbara B., supra,* 4 Cal.4th at p. 1083.)