[No. B091161. Second Dist., Div. Four. July 20, 1995.]

DAVID KLEIS, INC., et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
CALIFORNIA INSURANCE COMPANY et al., Real Parties in Interest.

1036

**COUNSEL**

LaTorraca & Goettsch, Raymond H. Goettsch and Eric R. Little for Petitioners.

No appearance for Respondent.

Charlston, Revich & Williams, Jeffrey A. Charlston and Chad B. Wootton for Real Parties in Interest.

## OPINION

HASTINGS, J.—Petitioners David Kleis, Inc., doing business as Beaumont Convalescent Hospital (Kleis), and Anthony Raoul David, its administrator (David), seek a writ of mandate directing the superior court to vacate its order denying their motion to stay the trial in their declaratory relief action against California Insurance Company (CIC) and Pacific Rim Assurance Company (Pacific Rim).[1]

Kleis and David (collectively referred to as petitioners) were named as defendants in four lawsuits filed in the District Court for the Central District of California in 1993, which were ultimately consolidated into one complaint (the federal court actions). The basic thrust of these lawsuits is that David, as administrator of Beaumont Convalescent Hospital (Beaumont), sexually harassed the four female plaintiffs who were under his supervision and control. As a result, each of the plaintiffs resigned her employment at Beaumont.

Petitioners tendered the defense of the federal court actions to Pacific Rim, the insurer that had issued Kleis workers' compensation and employer's liability policy, and to CIC, which had issued Kleis a general liability policy of insurance. Pacific Rim agreed to defend Kleis in the federal actions with counsel of its own choosing. Initially, CIC refused to provide Kleis with any defense whatsoever, then accepted the tender subject to a reservation of rights.

Petitioners then filed a declaratory relief action against CIC and Pacific Rim in July 1994 in order to determine the extent of the coverage under the policies (the declaratory relief action).[2] In February 1995, petitioners filed a motion to stay the declaratory relief action, which was denied on March 9, 1995.[3]

Petitioners sought a writ of mandate in this court seeking relief from the denial of the motion to stay. On April 6, 1995, we issued an alternative writ

---

[1]Pacific Rim has made no appearance in this writ proceeding and there has been no briefing of coverage issues relating to their policy. At the time we granted our alternative writ in this matter, Pacific Rim then had pending before the trial court a motion for summary adjudication on whether coverage existed. The motion was set for a date after we issued the alternative writ. At oral argument we were advised that Pacific Rim's motion was granted, we therefore do not address this matter with the Pacific Rim policy in mind.

[2]In the declaratory relief action, the breach of contract claims were severed from the bad faith claims and the priority status only extended to the breach of contract claims. CIC subsequently moved to stay discovery and litigation relating to the bad faith claims.

[3]Petitioners had initially sought priority status based on CIC's initial refusal to offer to defend and the trial court granted their request. After CIC agreed to defend petitioners, they then brought their motion to stay the declaratory relief action. CIC also moved to stay discovery and litigation relating to the bad faith claims.

and temporarily stayed the commencement of trial in the declaratory relief action.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *The Federal Court Actions.*

Each of the four individual federal court actions alleged claims for violations of title VII of the federal Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.), as well as state law claims for assault and battery, false imprisonment, defamation and slander, infliction of emotional distress (negligent and intentional), invasion of privacy, wrongful termination in violation of public policy, sexual harassment in violation of Government Code section 12940, breach of public policy, and common law claims for intentional infliction of emotional and physical harm. The four complaints shared some factual allegations but were not identical.

### *The Smith complaint*

Carol Lynne Smith was assistant to the activities director at Beaumont from February 28, 1991. In July 1991, she was promoted to director of activities. David, as administrator, was her immediate supervisor.

Her complaint alleged that between February 28, 1991, and November 3, 1992, on the premises of Beaumont, during working hours, David made sexually explicit and degrading comments to Smith in private and at staff meetings; inquired about her personal life, marital status and social contacts with members of the opposite sex; grabbed or touched Smith; threatened Smith at staff meetings with serious bodily harm if she reported his comments; forced her to stay in his office while he made sexual comments and touched her; and instructed her to dress provocatively at outside events to attract business. Smith sought relief from other supervisors at Beaumont, but no action was taken. As a result, on November 3, 1992, Smith left her employment at Beaumont.

### *The Denison complaint*

Febion Denison was a registered nurse supervisor at Beaumont from December 14, 1990, then was promoted to director of nurses in January 1991. David was her immediate supervisor.

Denison's complaint alleged that between January 1991 until October 23, 1992, on the premises of Beaumont and during working hours, David made

sexually explicit and degrading comments to her privately and at staff meetings; inquired about her personal life, marital status and contacts with the opposite sex; grabbed, touched or fondled her; threatened at staff meetings to "get back" at anyone who revealed his comments to others; ordered her to take off her clothes while she was in his office; ordered her to dress provocatively when the state surveyor visited the premises; and, on one occasion, summoned her into his office and grabbed her, commanding her to sit down when she attempted to leave. Denison sought relief from David and other supervisors, and when no action was taken, Denison left Beaumont's employ on October 23, 1992.

*The Manley complaint*

Jeanie Lee Manley was a nurse's aide at Beaumont from January 1992. David was her immediate supervisor.

Her complaint alleged that between January 1992 until September 1992, on premises of Beaumont and during working hours, David made sexually explicit and degrading comments to her privately in public situations; ridiculed her publicly and privately when she reported to him that another male employee of Beaumont had exposed himself to her; called her at home and threatened to fire her; and discouraged her from filing a workers' compensation claim for an accident. Manley attempted to seek relief from David and other supervisors at Beaumont, but, when no action was taken, she left work on September 20, 1992.

*The Remillard complaint*

Kathryn Jean Remillard was a certified nurse's assistant from August 13, 1986, and in September of 1990, was promoted to assistant to administrator. David was her immediate supervisor.

Remillard's complaint alleged that between January 1991 and October 1992, on the premises of Beaumont and during working hours, David made sexually explicit and degrading comments to her, touched and fondled her, inquired about her personal life, her marital status and her social contacts with members of the opposite sex; threatened her with a handgun if she did not orally copulate him; ridiculed her job performance; ordered her to dress provocatively when state auditors visited; placed a box of prophylactics with her belongings; and threatened to kill her or to fire her if she told anyone about their sexual contact. Remillard attempted to seek relief from David and other supervisors at Beaumont, but, when no action was taken, she left Beaumont's employ on October 30, 1992.

*The consolidated complaint*

On July 11, 1994, Remillard, Smith, Denison and Manley filed a consolidated complaint, which reiterated the factual allegations contained in the individual complaints, and specifically enumerated 47 separate incidents of sexual harassment and discrimination. The consolidated complaint named as defendants certain directors and shareholders of Kleis, and another employee, Michael Aquintano, in addition to David.

The consolidated complaint alleged that in June 1992, Aquintano fondled Manley during working hours on the premises of Beaumont, and that in July 1992, Aquintano exposed himself to Manley. Manley reported the incident to David, but David told her to "take it as a compliment," and later David threatened her that he would see she would not get another job if she told anyone about the Aquintano incident.

The complaint further alleged that the individual stockholders and directors of Kleis personally directed the activities of David and Aquintano; they were aware of the vulnerability of the plaintiffs and acquiesced in and were negligent in failing to act as David and Aquintano engaged in the systematic sexual activities and harassment, forcing plaintiffs to constructively terminate their employment. It was further alleged that they had employed David and Aquintano with advance knowledge of their unfitness, in conscious disregard of the rights and safety of others, and ratified the conduct by retaining them as employees, after learning of their conduct, by failing and refusing to discipline, reprimand or supervise them.

The claims for relief in the consolidated complaint were: (1) violation of title VII of the federal civil rights act; (2) assault and battery; (3) false imprisonment; (4) defamation and libel; (5) intentional and negligent infliction of emotional distress; (6) invasion of privacy; (7) wrongful termination; (8) sexual harassment in violation of California Government Code section 12940; and (9) common law claims of intentional infliction of emotional and physical harm.

2. *The CIC Policy.*

CIC issued a "Nursing Home Package Policy" (No. 0G9591424) to Kleis, effective August 1, 1991, to August 1, 1992. That policy included a "Health Care General Liability Coverage Form," which provides a grant of coverage under coverage A for "bodily injury" and under coverage B for "personal injury." The policy excludes from coverage liability visited upon the insureds for intentional acts as well as for liability arising out of defamation, discrimination, humiliation, harassment, or termination from employment.

### 3. *The Motion to Stay.*

On February 23, 1995, petitioners filed a motion to stay the declaratory relief actions, asserting that "CIC and Pacific Rim have, through their correspondence, demurrers and oppositions to plaintiffs' motions for summary judgment, repeatedly asserted, *inter alia*, that their defense duties are precluded by 'intentional act' exclusions, Insurance Code § 533, and Civil Code § 1668." Petitioners argued that in order to prove the acts fell within the intentional acts exclusion, CIC and Pacific Rim would have to try certain aspects of the underlying action to establish that the sexual harassment did in fact occur and that the insureds acted intentionally. They urged that this would be improper pursuant to *Montrose Chemical Corp.* v. *Superior Court* (hereinafter *Montrose I*) (1993) 6 Cal.4th 287 [24 Cal.Rptr.2d 467, 861 P.2d 1153].

CIC opposed the motion, urging that "[CIC] has no intention of proving . . . that the insured *in fact engaged* in intentional conduct. Rather, [CIC] will seek to establish that sexual harassment and discrimination of the nature *alleged* in the underlying actions is not covered under the relevant [CIC] policy. In demonstrating what the nature of the *alleged* misconduct is in the underlying actions, [CIC] will rely exclusively upon the complaints filed in the underlying action, the factual contentions made by the claimants in the underlying action (which may flesh out the allegations in the underlying complaints), and undisputed facts *already established* in the underlying actions." (Italics in original.) CIC then indicated that not only was it relying upon the intentional acts exclusion, it was also asserting that the conduct alleged did not fall within the term "occurrence," and that the conduct alleged falls within the "Employment Related Injury Exclusion." It concluded with the point that "there is no pattern of *negligent* conduct described in the Underlying Actions which could trigger a duty to defend." (Italics in original.)

At argument on the motion, the trial court indicated its tentative decision was to stay the matter pending outcome of the underlying litigation. CIC urged that it would not try to prove that the acts occurred but would rely solely upon the nature of the pleadings in the underlying actions and the depositions of the plaintiffs describing what took place. Counsel for CIC stated: "My focus only needs to be the subject matter. The subject matter of the underlying litigation is excluded under this policy. [¶] I know Your Honor expressed at the hearing on the demurrer some concern, which maybe there would be if there is a negligent supervision aspect. Even if there is negligent supervision, the subject matter is still excluded. [¶] If an employee was harassing another employee and the harasser was negligently supervised, doesn't make any difference. The subject matter that is being complained of is excluded and that's all you need to do."

Counsel for petitioners rejoined: "We will rely on the complaints in the underlying action, the consolidated complaint, and we will rely on the deposition testimony of the underlying plaintiffs, including the deposition testimony of Ms. Manley, where she alleges that . . . David negligently supervised one of Manley's peers, one of her co-employees who is not in a supervisory position to Ms. Manley. [¶] Ms. Manley alleges that Mr. Aquintano falsely imprisoned her in a bathroom at Beaumont . . . and that Beaumont['s] . . . liability for that and . . . David's liability for it arises out of David's supervision of Mr. Aquintano. . . . [¶] Your Honor, to prove that, though, they would have to show that it occurred within the course and scope of employment, and that would be adverse to . . . David and Beaumont . . . in the underlying action. [¶] . . . [¶] That is what he is going to try to prove, and obviously, Beaumont . . . and . . . David are going to try to show that they have no liability for these acts because Mr. Aquintano's acts were not within the course and scope of his employment. [¶] . . . [¶] So on that basis alone, there is [sic] grounds to defend because there would be collateral estoppel or res judicata to the underlying action."

The court indicated it would include within any order made that its findings would have no collateral estoppel effect on the underlying action. It then denied the request for stay.

### DISCUSSION

1. *The Procedural Dilemma.*

■ There are two basic duties set out within the typical insurance policy, the duty to defend and the duty to indemnify. An insurer must defend a case which potentially seeks damages within the coverage of the policy, even though it ultimately turns out that coverage may not be afforded. (*Montrose I, supra,* 6 Cal.4th at p. 295; *Gray* v. *Zurich Insurance Co.* (1966) 65 Cal.2d 263, 275 [54 Cal.Rptr. 104, 419 P.2d 168].) Therefore, the duty to defend has been determined to be much broader than the duty to indemnify. (*Gray* v. *Zurich Insurance Co., supra,* 65 Cal.2d at p. 275.)

The duty to defend, however, is not without limits, but is limited by the nature and kind of risk covered by the policy. (*La Jolla Beach & Tennis Club, Inc.* v. *Industrial Indemnity Co.* (1994) 9 Cal.4th 27, 39 [36 Cal.Rptr.2d 100, 884 P.2d 1048].) " '[T]he insurer need not defend if the third party complaint can *by no conceivable theory* raise a single issue which could bring it within the policy coverage.' (*Gray* v. *Zurich Insurance Co., supra,* 65 Cal.2d at p. 276, fn. 15; [*Montrose I*], *supra,* 6 Cal.4th at p. 300.)" (*La Jolla Beach & Tennis Club, Inc.* v. *Industrial Indemnity Co., supra,* 9 Cal.4th at p.

39; *Aetna Casualty & Surety Co.* v. *Superior Court* (1993) 19 Cal.App.4th 320, 327 [23 Cal.Rptr.2d 442], and cases cited therein, italics added.)

The distinction between the duty to defend and the duty to indemnify oftentimes places the carrier in a precarious situation. If it denies the insured a defense and it is ultimately determined that a defense was owed, the carrier can be subjected to a claim of bad faith and may ultimately be required to provide indemnity even where no duty to indemnify exists. (*Isaacson* v. *California Ins. Guarantee Assn.* (1988) 44 Cal.3d 775, 791 [244 Cal.Rptr. 655, 750 P.2d 297].) Alternatively, if a defense is provided and ultimately it is determined that no coverage existed for defense or indemnity, the carrier has needlessly expended monies providing a defense. Therefore, where the carrier provides a defense it is interested in resolving the issue of the duty to defend as early as possible.

On the other hand, the insured is interested in having a full defense provided whether coverage exists or not. Where a defense is being provided the insured has no real interest in an early determination of the coverage issues. However, when the carrier denies a defense: "Imposition of an immediate duty to defend is necessary to afford the insured what it is entitled to: the full protection of a defense on its behalf. [Citation.]" (*Montrose I, supra*, 6 Cal.4th at p. 295.)

■ Here, CIC originally denied a defense so petitioners brought this action for declaratory relief and sought an early trial date. Shortly thereafter, CIC reversed its position and began providing a defense. Petitioners no longer need an early trial date. On the other hand, now that CIC is providing a defense, it would like an early resolution of coverage. A problem arises when a determination of the duty to defend is dependent upon resolution of issues similar to those to be addressed in the underlying third party action.

■ Stay of a declaratory relief action to determine coverage is often in order when the coverage question turns on facts to be litigated in the underlying third party action "[t]o eliminate the risk of inconsistent factual determinations that could prejudice the insured. . . ." (*Montrose I, supra*, 6 Cal.4th at p. 301.) The "classic" situation in which a declaratory relief action should be stayed is where the third party seeks damages based on the insured's negligence, and the insurer seeks to avoid providing a defense by arguing that the insured acted intentionally. By contrast, however, ". . . when the coverage question is logically unrelated to the issues of conse- quence in the underlying case, the declaratory relief action may properly proceed to judgment." (*Montrose I, supra*, at p. 302.)

"There are three concerns which the courts have about the trial of cover- age issues which necessarily turn upon the facts to be litigated in the

underlying action. *First,* the insurer, who is supposed to be on the side of the insured and with whom there is a special relationship, effectively attacks its insured and thus gives aid and comfort to the claimant in the underlying suit; *second,* such a circumstance requires the insured to fight a two front war, litigating not only with the underlying claimant, but also expending precious resources fighting an insurer over coverage questions—this effectively undercuts one of the primary reasons for purchasing liability insurance; and *third,* there is a real risk that, if the declaratory relief action proceeds to judgment before the underlying action is resolved, the insured could be collaterally estopped to contest issues in the latter by the results in the former. ■ It is *only* where there is no potential conflict between the trial of the coverage dispute and the underlying action that an insurer can obtain an early trial date and resolution of its claim that coverage does not exist. (*[Montrose Chemical Corp.* v. *Superior Court] Montrose II* [(1992) 25 Cal.App.4th 902, 910 (31 Cal.Rptr.2d 38)]).” (*Haskel, Inc.* v. *Superior Court* (1995) 33 Cal.App.4th 963, 979 [39 Cal.Rptr.2d 520], fn. omitted, italics in original.)

## 2. *Determination of the Duty to Defend.*

■ In determining whether an insurer has a duty to defend, one must first compare the allegations of the complaint with the terms of the policy. Next, it must be ascertained whether facts not alleged in the complaint, but known by the insurer at the inception of the lawsuit, reveal a possibility that the claim is covered by the policy. (*Montrose I, supra,* 6 Cal.4th at p. 295; *Horace Mann Ins. Co.* v. *Barbara B.* (1993) 4 Cal.4th 1076, 1081 [17 Cal.Rptr.2d 210, 846 P.2d 792].) A duty to defend may exist, therefore, even though the face of the complaint does not reflect a potential for liability under the policy. (*Gray* v. *Zurich Insurance Co., supra,* 65 Cal.2d at p. 276.) “This is so because current pleading rules liberally allow amendment; the third party plaintiff cannot be the arbiter of coverage. (*Ibid.*)” (*Montrose I, supra,* at p. 296.)[4]

## 3. *Review of the Coverage Issues.*

■ The CIC policy has two separate coverages. We address each coverage separately, to the extent that they differ.

---

[4]At the same time the motion to stay was argued there was also a motion relating to discovery. Petitioners sought discovery of the claims file which was denied by the court on the basis that nothing in the claims file would be relevant to the declaratory relief action. Pursuant to these authorities, information contained in the claims file may in fact be relevant to the issue of coverage.

### a. *Coverages*

### COVERAGE A

The grant of coverage for this portion of the policy provides: "COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY [¶] 1. Insuring Agreement. [¶] a. We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies . . . caused by an 'occurrence'. . . ." Under "SECTION V—DEFINITIONS," the following definition is pertinent: "3. 'Bodily injury' means bodily injury, sickness or disease sustained by a person, including death. . . ."

Initially, it appears that at least some of the claims made in the underlying action could fall within this coverage, which is defined by the nature of the injury, not to any type of activity out of which the injury arose. The facts alleged in the underlying action indicate classical circumstances out of which "bodily injury" could arise.

CIC relies upon one of the exclusions relating to this coverage, as follows: "2. Exclusions. [¶] This insurance does not apply to: [¶] . . . [¶] e. 'Bodily injury' to: [¶] (1) An employee of the insured arising out of or in the course of employment by the insured; [¶] . . . [¶] This exclusion applies: [¶] (1) Whether the insured may be liable as an employer or in any other capacity. . . ." During argument before this court, CIC urged that all of the alleged claims in the underlying suit arose out of the course of employment, therefore a determination of noncoverage could be made on this ground alone without having to try issues which may arise in the underlying case. We agree that it may be possible to address this exclusion without impinging upon issues to be tried in the underlying case. However, this exclusion is only applicable to coverage A. Coverage B, discussed next, specifically provides coverage for claims arising out of the conduct of the insured's business.

### COVERAGE B

This coverage is titled "PERSONAL AND ADVERTISING INJURY LIABILITY"[5] and provides a grant of coverage as follows: "1. Insuring Agreement. [¶] a. We will pay those sums that the insured becomes legally obligated to pay as damages because of 'personal injury' . . . to which this insurance applies. . . . The 'personal injury' . . . must be caused by an 'occurrence.'. . . [¶] b. This insurance applies to 'personal injury' only if caused

---

[5]There is apparently no claim that any of the activities involved in the underlying action fall within the concept of "advertising injury." Therefore, we do not address that portion of coverage B.

by an offense: [¶] . . . [¶] (2) *Arising out of the conduct of your business.
. . .*" (Italics added.) Under "SECTION V—DEFINITIONS [¶] . . . [¶] 'Personal injury' means injury, other than 'bodily injury,' arising out of one or more of the following offenses: [¶] a. False arrest, detention or imprisonment; [¶] . . . [¶] d. Oral or written publication of material that slanders or libels a person . . . ; or [¶] e. Oral or written publication of material that violates a person's right of privacy."

Coverage B differs from coverage A in that it grants coverage for injury arising out of specific types of offenses, some of which are specifically alleged within the underlying action: false imprisonment, defamation, and invasion of the right of privacy. The underlying action also alleges that all of the activity arose during the course of employment. Therefore, unless there are specific exclusions which apply, it appears that this grant of coverage potentially affords coverage for some of the alleged wrongs.

b. *Exclusions*

OCCURRENCE/INTENTIONAL ACTS

The term "occurrence" is utilized in both grants of coverage. Under "SECTION V—DEFINITIONS," the definition of "occurrence" is as follows: " 'Occurrence' means an accident, including continuous or repeated exposure to substantially the same general harmful conditions."[6]

The emphasis here is on the term "accident," a term not defined in the policy. However, case law has construed the term to mean that if someone intentionally does an act resulting in injury it does not matter if the actor expected or intended that any harm may occur—the incident does not fall within the term "occurrence." (*Collin* v. *American Empire Ins. Co.* (1994) 21 Cal.App.4th 787, 806 [26 Cal.Rptr.2d 391].) In part, this concept overlaps with the intentional acts exclusion discussed next. However, under coverage B, CIC's policy obviously considers the fact that false imprisonment, defamation and the breach of right of privacy may be occasioned by an occurrence, otherwise it would be surplusage to include these acts within the grant of coverage.

Coverage A contains the traditional intentional acts exclusion which states: "2. Exclusions. [¶] This insurance does not apply to: [¶] a. 'Bodily injury' or 'property damage' expected or intended from the standpoint of the insured." Coverage B does not have this exclusion but does exclude coverage for "Personal injury' . . . : [¶] (1) Arising out of oral or written

---

[6]The allegations of the underlying action do relate to a claim of repeated exposure to harmful conditions.

publication of material, if done by or at the direction of the insured *with knowledge of its falsity*; . . . [¶] (3) Arising out of the *willful violation of a penal statue or ordinance* committed by or with the *consent* of the insured. . . ." (Italics added.) We note that absent from this exclusion is any specific reference to false arrest, detention or imprisonment.

The landmark case relating to the intentional act exclusion is *Gray* v. *Zurich Insurance Co., supra*, 65 Cal.2d 263. In that case an insured was sued by a claimant who pled that the insured ' "willfully, maliciously, brutally and intentionally assaulted' him; he prayed for actual damages of $50,000 and punitive damages of $50,000." (*Id.* at p. 267.) The carrier refused to defend, relying upon the intentional acts exclusion. The insured sued the carrier for failure to defend. The issue in the case was presented as follows: "The main issue turns on the argument of the insurer that an exclusionary clause of the policy excuses its defense of an action in which a plaintiff alleges that the insured intentionally caused the bodily injury." (*Id.* at pp. 266-267.) The Supreme Court concluded that a duty to defend existed because there was a potential for coverage: "Moreover, despite Jones' pleading of intentional and wilful conduct, he could have amended his complaint to allege merely negligent conduct. Further, plaintiff [the insured in this action] might have been able to show that in physically defending himself [against the plaintiff in the underlying action], even if he exceeded the reasonable bounds of self-defense, he did not commit willful and intended injury, but engaged only in nonintentional tortious conduct. Thus, even accepting the insurer's premise that it had no obligation to defend actions seeking damages not within the indemnification coverage, we find, upon proper measurement of the third party action against the insurer's liability to indemnify, it should have defended because the loss could have fallen within that liability." (*Id.* at p. 277.)

*Gray* clearly places the focus upon the mental state of the insured when undertaking a course of conduct. If the insured mistakenly believed that he had a right to defend himself, or was mistaken with regard to the extent with which he could use force, the act would not be intentional and coverage would exist. As previously noted, in *Montrose I, supra*, 6 Cal.4th at page 302, our Supreme Court held that where the underlying action will focus upon whether the acts are intentional or otherwise is "the classic situation in which a declaratory relief action should be stayed."

There is no real distinction for our purposes between the traditional exclusion in coverage A and the exclusions in coverage B. Each exclusion impliedly recognizes that if the acts are not knowingly or willfully carried out then coverage may exist. Therefore, to the extent that CIC may rely upon

the definition of "occurrence" or the intentional acts exclusions to preclude coverage, trial of the declaratory relief action cannot proceed ahead of the underlying action.

### c. *The Harassment Exclusions*

Both coverages have their own individual exclusions for injury arising out of defamation, discrimination, humiliation, harassment and termination of employment. The policy has a separate endorsement which reads, in part: "Changes In Policy—General Liability [¶] . . . [¶] This insurance does not apply to 'bodily injury,' 'property damage,' or 'personal injury' to an employee or former employee of an insured arising out of defamation, discrimination, humiliation, harassment, or termination from employment." This endorsement applies to both coverages A and B and trumps the individual exclusions contained in each coverage.

We have no difficulty construing this exclusion to mean that there is no coverage under the policy for damages of any nature, whether termed "bodily injury" or "personal injury," which are attributed to discrimination based upon sex, sexual harassment, and wrongful termination. It also appears to completely exclude any claims by an employee or former employee for defamation.

CIC contends that the only interpretation to be attributed to the claims in the underlying action is that they arise out of a continual course of sexual harassment. It argues that despite the fact that certain isolated acts may fall within the rubric of "false imprisonment," these acts occurred during the course of sexual misconduct and such a course of conduct can only be intentional and willful, relying upon *Coit Drapery Cleaners, Inc.* v. *Sequoia Ins. Co.* (1993) 14 Cal.App.4th 1595 [18 Cal.Rptr.2d 692]. We think *Coit* is distinguishable from the situation presented here.

In *Coit*, an employee sued her former employer for sexual harassment in violation of Government Code section 12940 et seq. (the Fair Employment and Housing Act), invasion of privacy, wrongful termination, breach of public policy, infliction of emotional distress, fraud, and battery. She alleged that the president of the employer corporation, who "relished his reputation around the company as 'a dirty old man,'" and who had a long history of sexually harassing young female employees, had made numerous sexual advances towards her, and then terminated her for rejecting those advances. The complaint also alleged that the president's actions were well known and tolerated by the corporation, and she was told by management that he was "harmless." (14 Cal.App.4th at pp. 1599-1600.) The former employer tendered defense of this action to its general liability insurer, which declined to

defend. After the sexual harassment suit was settled by the employer, the employer sued the insurer for breach of contract and bad faith. In the bad faith action, the trial court found, and the appellate court agreed, that the acts of sexual harassment and wrongful termination were intentional acts, and thus not covered by the general liability policy under its own terms and pursuant to Insurance Code section 533. The appellate court stated: "Review of the allegations made by [the employee], *and the evidence presented to the trial court* concerning the sexual harassment and employment termination in issue here, shows no credible argument that this alleged wrongful conduct could be anything other than intentional and willful. One does not, for instance, try to force an unwilling subordinate employee to the floor for intercourse, or fire her for refusing sexual favors, as a result of mere negligence." (14 Cal.App.4th at p. 1602, italics added.) The court also rejected the theory that the claims were a result of negligent supervision since no such cause of action was alleged in the complaint and the employee's counsel had conceded at an earlier point that negligent supervision was not the issue. (*Id.* at p. 1605.) "We emphasize that we are dealing here with a case in which the acts of sexual harassment alleged are, by their very nature, intentional and wrongful; it would be contrary to public policy to allow a wrongdoer which is directly and strictly liable for such wrongdoing . . . to shift the loss resulting from such an unlawful corporate practice to its insurer. [Citations.]" (*Id.* at pp. 1606-1607.)

Application of *Coit* is premature at this stage. In *Coit*, the factual allegations of sexual misconduct were fully litigated during trial of the bad faith claim. This occurred after the third party lawsuit had been settled and the parties were free to litigate the nature of the alleged actions. Here, the facts have yet to be determined in the underlying action. Also, as noted in the opinion, the parties in *Coit* conceded that negligent supervision was not an issue. Such a claim is involved in this case.

We have no doubt that much of the activity alleged in the underlying action here discloses activity which can clearly be classified as sexual misconduct. However there are other actions alleged which may fall outside that claim. For example, Manley asserts that she was discouraged from filing a workers' compensation claim relating to an accident she suffered on the job. Also, a claim of sexual misconduct may give rise to a potential defense of consent or mistaken belief in the right to engage in the conduct, thus negating any intent to sexually harass or discriminate against the victim. The fact that the victim construed the activity as sexual misconduct, and filed a claim on that basis, does not preclude a jury from finding that no sexual harassment took place but that a false imprisonment or detention did occur. As previously noted, the policy does provide coverage for false imprisonment occasioned by an "occurrence."

In *Horace Mann Ins. Co.* v. *Barbara B.*, *supra*, 4 Cal.4th 1076, in discussing the insurer's duty to defend its insured, a teacher, against child molestation charges, the Supreme Court stated: "Although lacking in specificity, the complaint evinced a possibility that [the insured] would be held liable for damages within the coverage of the policy stemming from [his] negligent nonsexual conduct in his public relationship with [his student]. [¶] . . . . Nothing in the complaint or the materials submitted in connection with the summary judgment proceedings enabled [the insurer] to determine that those allegations were related to the molestation, or that the other alleged misconduct was outside the course of [the insured's] educational employment activities. A teacher's education role requires constant, close interaction with students; it is not always easy for a court to draw the line between appropriate and inappropriate interaction. Neither precedent nor logic dictates that a molester cannot also be liable for torts of negligence against the victim which are apart from, and not integral to, the molestation." (*Id.* at p. 1083.)

We conclude that the concept of fault, whether it be related to the intentional acts exclusion or knowledge of the actor, cannot be divorced from these exclusions. The record presented to the trial court was insufficient to conclude that the issues to be tried in the declaratory relief action did not infringe upon the issues to be tried in the underlying action.

### 4. *Waiver.*

Real party CIC argues that petitioners waived their right to a stay because they had moved for priority in trial setting earlier in the litigation. Petitioners argue that the reason they did so was because at that point CIC had refused to accept their tender, and they were forced at that point to seek an early declaration of rights in order to insure that CIC would defend them in federal court. We agree that due to the change in circumstances, i.e., the belated acceptance of tender, any motion for early trial setting did not operate as a waiver of their right to subsequently request a stay of the declaratory relief action.

### DISPOSITION

Let a peremptory writ of mandate issue directing the respondent superior court to set aside and vacate its order denying petitioners' motion to stay trial of this action and instead to issue an order granting the motion. This is without prejudice to the rights of the parties to separately address coverage issues by motion or otherwise as long as it can be done without impinging upon issues to be tried in the underlying action.

The alternative writ is discharged. The temporary stay order is terminated. Costs are awarded to petitioners.

Woods (A. M.), P. J., and Vogel (C. S.), J., concurred.

The petition of real parties in interest for review by the Supreme Court was denied October 26, 1995.