[No. C036415. Third Dist. June 9, 2003.]

JEAN MARIE UHRICH, Plaintiff and Appellant, v.
STATE FARM FIRE & CASUALTY COMPANY, Defendant and
Respondent.

## COUNSEL

Bien & Summers, E. Elizabeth Summers; Douglas E. Lord; Stoddard, Pfeiffer, Bergquist & Wood and Steven N.H. Wood for Plaintiff and Appellant.

Chapman, Popik & White, Susan M. Popik and Amy O'Keefe for Defendant and Respondent.

## OPINION

**MORRISON, J.**—Plaintiff Jean Marie Uhrich sued Paul Alan Lindseth on a number of legal theories. Lindseth tendered defense of the suit to his two

insurance companies: American Home Assurance Company (American), which declined to provide a defense, and State Farm Fire & Casualty Company (State Farm, defendant herein), which provided a defense, but then withdrew under a reservation of rights.

Uhrich and Lindseth settled the underlying case, and Lindseth assigned his bad faith claims to Uhrich. After a monetary judgment was entered in the underlying suit, Uhrich sued the insurers seeking payment of policy limits toward the judgment, and bad faith damages for wrongful refusal of a defense for Lindseth. The trial court granted State Farm's summary judgment motion and Uhrich filed this appeal from the ensuing judgment. Uhrich obtained a judgment against American, which is now pending on appeal in a separate action. (*Uhrich v. American Home Assurance Co.* (C037332, app. pending).)

In this appeal, Uhrich contends State Farm had a duty to defend Lindseth because there was a possibility of coverage for some of her claims against him. We disagree and shall affirm the judgment.

## I. BACKGROUND

### A. *The Policy*

State Farm issued Lindseth a $1 million "Personal Liability Umbrella Policy" which we will assume covered the relevant time period. A "loss" was defined as "an accident that results in personal injury or property damages during the policy period." "Personal injury" meant "bodily harm, sickness, disease, shock, mental anguish or mental injury," as well as specified torts such as false imprisonment, defamation, invasion of privacy and assault and battery.

The policy excluded personal injury "a. which is either expected or intended by you; or [¶] b. to any person or property which is the result of your willful or malicious act." The policy also excluded coverage for "any loss caused by providing or failing to provide a professional service" and "any loss caused by your business operations or arising out of business property." "Business" was "a trade, profession or occupation," and "business property" referred to realty, not personalty.

### B. *The Underlying Complaint*

#### 1. *Factual Allegations*

On May 25, 1994, Uhrich sued Lindseth (*Uhrich v. Lindseth* (Super. Ct. Sac. County, No. 540825)), asserting numerous legal theories arising out of a vendetta by Lindseth, ending in a conspiracy to pervert justice.

Lindseth, a psychologist, treated Uhrich from 1987 to 1989. During that period, Lindseth hired her to form and direct a residential treatment facility. Uhrich sued Lindseth (*Uhrich v. Lindseth* (Super. Ct. Sac. County, No. 514920)) alleging malpractice, breach of contract and related claims. Uhrich and Lindseth settled. Lindseth paid Uhrich $110,000 and released a conversion cross-claim alleging Uhrich had stolen patient files from the treatment facility. Lindseth was also obliged to attend a confrontational mediation session with Uhrich, but he breached the conditions therefor.

Meanwhile the California Attorney General had begun a disciplinary proceeding against Lindseth, alleging misconduct relating to Uhrich and another patient, particularly alleging inadequate recordkeeping. Lindseth defended in part by alleging Uhrich stole his patient files and records.

Lindseth also enlisted two men (Splawn and Johnson) into a conspiracy to convince the authorities that Uhrich had in fact stolen his files, and used or planned to use them for extortion, and had perjured herself during the first case.

The conspirators provided false information that led to the issuance of a search warrant for Uhrich's house. Uhrich alleged the search was degrading, officers seized her diary and personal and business records, and confidential information was disclosed to Lindseth. The criminal investigation was eventually dropped and her personal property was returned.

### 2. *Legal Theories*

Uhrich framed her complaint in terms of numerous legal theories, wrongly denominated as separate causes of action. (See *Slater v. Blackwood* (1975) 15 Cal.3d 791, 795-796 [126 Cal.Rptr. 225, 543 P.2d 593]; *Barrett v. Superior Court* (1990) 222 Cal.App.3d 1176, 1181-1182 [272 Cal.Rptr. 304].) ▮ Further, the complaint employs the disfavored practice of incorporating all or most prior paragraphs within each purported cause of action. "This type of pleading should be avoided as it tends to cause ambiguity and creates redundancy." (*Kelly v. General Telephone Co.* (1982) 136 Cal.App.3d 278, 285 [186 Cal.Rptr. 184].) Our summary does not track the complaint, which improperly labels issues such as emotional distress damages and civil conspiracy liability as counts or causes of action. Uhrich claimed:

1. Malpractice—for breach of "continuing duties" after Lindseth stopped treating Uhrich, by revealing information gleaned during therapy, for breaching the first settlement and falsely reporting perjury and theft of patient files and by failing to prevent " 'countertransference.' "

2. Interference with prospective economic advantage.

3. Malicious prosecution or abuse of process.

4. "Stalking"—for pestering Uhrich and her parents and threatening or attempting vandalism and burglary against her, and planting evidence to incriminate her.

5. Assault and battery—for causing peace officers to make offensive contact with Uhrich.

6. False imprisonment—for making false statements that resulted in the search warrant.

7. Trespass—for causing entry into her residence pursuant to the search warrant.

8. Conversion or trespass to chattel—for detention of personal property during and after execution of the warrant.

9. Defamation—for making three defamatory statements "to multiple third parties," viz. (1) Uhrich perjured herself, (2) she stole files, and (3) she "posed an immediate danger to the public through extortion of the patients."

10. Intentional infliction of emotional distress—based on the above conduct.

11. Negligence, characterized as "Negligent Infliction of Emotional Distress" or NIED.

12. Invasion of privacy.

### C. *The Tender and Withdrawal*

On February 23, 1995, State Farm accepted defense of the underlying case with a reservation of rights, stating it did not believe there was any coverage under any of Lindseth's policies (only the umbrella policy is at issue).

Lindseth later pleaded guilty to conspiracy to "pervert and obstruct justice" as detailed below. State Farm then withdrew its defense, for lack of coverage.

### D. *The Second Settlement and Judgment*

On March 4, 1997, Uhrich and Lindseth settled the underlying case. Lindseth paid $190,000 and assigned his bad faith choses in action to

Uhrich. The parties stipulated to entry of a judgment "for each and every cause of action in the Complaint . . . in an amount to be determined by the Court at a prove-up hearing."

At that hearing, Uhrich submitted evidence including a memorandum supported by declarations of herself, Splawn and Johnson. Most of the claimed damages ($2.5 million) were for mental anguish. The punitive damages represented about 90 percent of Lindseth's net worth (including "present value earning capacity").

On May 6, 1997, the trial court issued a judgment reciting that the *stipulation* stated the judgment would be "for each and every cause of action." Contrary to an assumption in Uhrich's brief, the judgment does not assign damages to each cause of action. For "tortious conduct" it awards damages ($3,948,425), plus—for "some of [Lindseth's] actions"—punitive damages ($1.5 million) plus attorney fees ($339,138). Fees were available because Uhrich was the victim of Lindseth's felony. (See Code Civ. Proc., § 1021.4.) The judgment as a whole (and not for each claim) is "for each and every cause of action."

### E. *The Instant Coverage Suit*

Uhrich asked State Farm to pay the policy limit of $1 million. State Farm refused.

On April 8, 1999, Uhrich sued State Farm (and American) in the instant lawsuit for bad faith and failing to pay on the judgment. (Ins. Code, § 11580, subd. (b)(2).) The court granted State Farm's motion for summary judgment and Uhrich appealed from the ensuing judgment.

The trial court found in part: "(1) any claims for breach of professional duties are barred by the professional services exclusion of the policies; (2) any claims for bodily injury or property damage arising out of Lindseth's intentional or criminal conduct fall within the exclusions for intentional or willful acts of the insured; and (3) any claims for personal injury were caused by Lindseth's business operations and excluded from the . . . policy."

### II. STANDARD OF REVIEW

We review de novo an order granting summary judgment. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 860 [107 Cal.Rptr.2d 841, 24 P.3d 493] (*Aguilar*).) We need only address sufficient grounds to

affirm. (*Charpentier v. Von Geldern* (1987) 191 Cal.App.3d 101, 107 [236 Cal.Rptr. 233].)

■ The meaning of the policy is a legal question. (*Jauregui v. Mid-Century Ins. Co.* (1991) 1 Cal.App.4th 1544, 1548 [3 Cal.Rptr.2d 21].)
■ " 'To prevail [on the issue of the duty to defend], the insured must prove the existence of a *potential for coverage,* while the insurer must establish *the absence of any such potential.* In other words, the insured need only show that the underlying claim *may* fall within policy coverage; the insurer must prove it *cannot.* . . . [¶] Nevertheless, the obligation to defend is not without limits. 'Rather, such a duty is limited by "the nature and kind *of risk covered by the policy.*" ' [Citations.] ' "[T]he duty to defend derives from the insurer's coverage obligations assumed under the insurance contract." [Citation.] Thus, "where there is *no potential* for coverage, there is no duty to defend." ' " (*Quan v. Truck Ins. Exchange* (1998) 67 Cal.App.4th 583, 591-592 [79 Cal.Rptr.2d 134] (*Quan*); see *Legarra v. Federated Mutual Ins. Co.* (1995) 35 Cal.App.4th 1472, 1479 [42 Cal.Rptr.2d 101].)

In assessing coverage and exclusion issues, we look primarily to the allegations of the underlying complaint: Ambiguities are construed in favor of the insured. (*Kazi v. State Farm Fire & Casualty Co.* (2001) 24 Cal.4th 871, 879 [103 Cal.Rptr.2d 1, 15 P.3d 223].)

### III. DISCUSSION

We will conclude the undisputed facts known to State Farm at the time it withdrew coverage show Lindseth's conduct was no accident. If some of his conduct could be characterized as negligent, we reject State Farm's view that its business operations exclusion precludes coverage, but agree with State Farm that any coverage was barred by the professional services exclusion. Absent any possibility of coverage for any claims, State Farm owed no duty to defend.

### A. *No Coverage Absent an Accident*

■ Uhrich asserts the following claims show there was a possibility of coverage under the umbrella policy: assault and battery; defamation; wrongful detention; trespass; conversion; invasion of privacy; and "negligent infliction of emotional distress and its basis in Lindseth's failing to participate in the confrontational mediation session."

Because, says Uhrich, Lindseth's conduct undergirding the above torts could have been reckless or negligent, personal injury was not necessarily

intended or expected by him. Although she mentions the seven claims just listed, she focuses on defamation and Lindseth's breach of the mediation provision of the first settlement, which she characterizes as NIED. She asserts the intentional act exclusion only applies where the insurer can prove the insured's subjective state of mind, and can prove that personal injury was intended. She claims that "State Farm offered no evidence its insured expected or intended to commit the personal injury offenses of which he stood accused." We disagree with Uhrich.

Insurance Code section 533 (section 533) provides: "An insurer is not liable for a loss caused by the wilful act of the insured; but he is not exonerated by the negligence of the insured, or of the insured's agents or others." We will focus on the policy language, although some of the authorities we discuss instead apply section 533. ■ We must keep in mind that "Because the exclusion embodied in section 533 is a statute, the normal rules of contract interpretation do not apply. Rather, the rules of *statutory* construction control. [Citation.] Thus, in interpreting this statutory language we do not construe any ambiguity which may exist against the insurer, but instead we construe the statutory language so as to effectuate the legislative purpose and intent. . . . [T]hat legislative purpose is both clear and unequivocal. It is to deny insurance coverage for wilful wrongs." (*Downey Venture v. LMI Ins. Co.* (1998) 66 Cal.App.4th 478, 500, fn. 32 [78 Cal.Rptr.2d 142] (*Downey*).)

The policy covered personal injury, which included "bodily harm, . . . mental injury." It excluded personal injury "which is either expected or intended by you." Similar language often delimits coverage. (*Royal Globe Ins. Co. v. Whitaker* (1986) 181 Cal.App.3d 532, 537 [226 Cal.Rptr. 435] [coverage for accidents "neither expected nor intended" by insured].) It also occurs as an exclusion. (*Merced Mutual Ins. Co. v. Mendez* (1989) 213 Cal.App.3d 41, 44 [261 Cal.Rptr. 273] [exclusion for injury "expected or intended" by insured] (*Merced Mutual*).)

■ But coverage here must be triggered by a "loss," viz., an "accident that results in personal injury." A result which is expected or intended is not an accident. Therefore, the first issue we face is a *coverage* question, rather than an *exclusion* question. (*Merced Mutual, supra,* 213 Cal.App.3d at pp. 46-51.) "An accident . . . is never present when the insured performs a deliberate act unless some additional, unexpected, independent, and unforeseen happening occurs that produces the damage." (*Id.* at p. 50.) Uhrich ultimately bears the burden to show coverage before State Farm needs to invoke an exclusion. (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 16 [44 Cal.Rptr.2d 370, 900 P.2d 619] (*Waller*); *Interinsurance Exchange v. Flores* (1996) 45 Cal.App.4th 661, 669 [53 Cal.Rptr.2d 18] (*Flores*).)

■ "It is common to hear the argument that if the underlying complaint alleges negligence, there must be a duty to defend. This is not necessarily true. The duty to defend depends upon the coverage provided by the policy—the 'nature and kind of risk covered'—which in turn depends upon the wording of the coverage clauses. . . . [T]he threshold question is not whether an unclear exclusionary provision applies, 'but rather the scope of coverage itself: whether the conduct in question constitutes an accident within the meaning of the policy provision.' . . . [¶] To avoid the consequences of the conclusion that no 'accident' has been alleged, the insured argues he might be found merely 'negligent,' . . . Such arguments misconstrue the 'accident' requirement in standard general liability policies. 'Under California law, the term refers to *the nature of the insured's conduct, not his state of mind.*' [Citation.] 'Negligent' or not, in this case the insured's conduct alleged to have given rise to claimant's injuries is necessarily nonaccidental, not because any 'harm' was intended, but simply because the conduct could not be engaged in by 'accident.'" (*Quan, supra*, 67 Cal.App.4th at pp. 595-596.)

■ Although Uhrich claims the expected or intended exclusion "does not turn on the 'intentional' quality of the insured's conduct, but on the insured's intent or expectation regarding the outcome of his or her conduct," she provides no citation to authority for this proposition, which conflicts with the cases we have just discussed. Moreover, in this case it makes no difference, as we will show.

Uhrich points out that the policy partly defined "personal injury" as "assault," "wrongful detention" and "defamation" and argues these torts are intentional: To say assault is not covered because it is not caused by an accident would, in her view, demonstrate illusory coverage. (See, e.g., *Safeco Ins. Co. v. Robert S.* (2001) 26 Cal.4th 758, 764 [110 Cal.Rptr.2d 844, 28 P.2d 889] [rejecting construction of exclusion which "is so broad as to render the policy's liability coverage practically meaningless"].)

■ But the torts Uhrich mentions can be committed via negligent conduct. A claim of assault may give rise to a duty to defend, because a jury could conclude the insured unreasonably responded to a perceived threat. (See *Gray v. Zurich Insurance Co.* (1966) 65 Cal.2d 263, 277 [54 Cal.Rptr. 104, 419 P.2d 168] (*Gray*).) A wrongful detention could be found if a store detained a customer without reasonable cause. (Cf. *King v. Andersen* (1966) 242 Cal.App.2d 606, 609 [51 Cal.Rptr. 561].) Contrary to Uhrich's claim, an insured could be liable for defamation for negligently publishing a defamatory statement. (*Hellar v. Bianco* (1952) 111 Cal.App.2d 424, 426-427 [244 P.2d 757, 28 A.L.R.2d 1451]; Rest.2d Torts, § 577; 5 Witkin, Cal. Procedure (9th ed. 1988) Torts, § 477, p. 561.)

 These examples illustrate the point that claims do not exist in the ether, they consist of pleaded allegations coupled with extrinsic facts. That is what defines the insurer's coverage duties, not the label chosen by the pleader. (*Gray, supra,* 65 Cal.2d at p. 276.) Facts extrinsic to the complaint can defeat as well as invoke coverage. (*Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287, 296-299 [24 Cal.Rptr.2d 467, 861 P.2d 1153]; *Waller, supra,* 11 Cal.4th at p. 19.) Uhrich cannot invoke coverage simply by pleading "negligence" in the complaint, nor by assuming *all* assaults, defamations and so forth must be covered, simply because those labels are included in the policy definition of personal injury. State Farm was entitled to consider extrinsic facts at its disposal to determine whether there was a possibility of coverage *due to an accident.* As we shall now explain, the evidence showed the opposite. Not only did State Farm have evidence showing Lindseth's conduct was intentional, it also had evidence showing he intended to inflict harm. No covered accident occurred.

Uhrich contends statements by State Farm's counsel at the hearing preclude State Farm from making its coverage argument on appeal, which it also characterizes as a new claim which she had no opportunity to meet in the trial court. We disagree. The facts underpinning the argument are supported by the policy language tendered in the summary judgment proceeding, and the issue—that Uhrich had to show an "accident" to invoke coverage—was included within State Farm's moving papers. Uhrich had the chance to meet the argument in her opposition papers and at the hearing. In fact, the point was argued in Uhrich's memorandum in support of her summary adjudication motion. The fact State Farm pressed its *exclusion* arguments, rather than the *lack of coverage* argument at the hearing on its motion, does not preclude State Farm from pressing the coverage claim on appeal.

### B. *Evidence of Lindseth's Evil Intent*

#### 1. *Judicial Estoppel*

In large measure, Lindseth's motive is demonstrated by Uhrich's judicial assertions which she cannot gainsay.

In her effort to recover from Lindseth, Uhrich made a number of judicial admissions regarding his intent. In a declaration filed in support of the monetary judgment, she stated under penalty of perjury that based on sworn statements of the district attorney's investigator (McVey), the coconspirators, Lindseth, and the other evidence unearthed "by me and my agents," the underlying action "arises from [Lindseth's] deviant, criminal conspiracy"

against her. Uhrich had also filed a declaration in Lindseth's criminal case stating she was the victim of Lindseth's "revenge and retribution"; Lindseth sought revenge because of the first suit, her complaint to the board of psychology, and "to conjure up a defense" to the disciplinary case; and Lindseth tracked Uhrich and "paid accomplices in an attempt to have me falsely arrested," showing a "perverse desire to seek revenge and retribution against me."

In addition, Uhrich's counsel made statements in aid of judgment in the underlying case as follows: In a memorandum "in support of judgment," Uhrich's attorney (Wood) asserted without qualification that "This action arises from former psychologist [Lindseth's] deviant, criminal conspiracy" against Uhrich. "During the pendency of [the] disciplinary action, [Lindseth] paid [the co-conspirators] to help plan and execute a deviant plot against [Uhrich], motivated by [his] need to create a defense to the disciplinary action and retribution for the [first] lawsuit." This included "script[ing] and extensively rehears[ing] a false, incriminating story against" Uhrich. Based on the evidence at his disposal, he believed "this action arises from" the "deviant, criminal conspiracy" elsewhere described.

The above admissions (and other statements known to State Farm) were alleged as part of State Farm's statement of undisputed facts, and in her responses thereto, Uhrich objected or disputed their effect, but the objections were overruled. For example, as to the statements by Uhrich and Wood about the action arising out of a conspiracy, Uhrich insisted the complaint spoke for itself. As to Uhrich's statements regarding Lindseth's vengeful motive, Uhrich pointed to the judgment on her complaint, asserting that some of the allegations of the complaint were based on reckless and negligent conduct.

By lodging objections to this evidence, and obtaining explicit adverse rulings thereon, Uhrich preserved the issues for review. (Cf. *Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 670, fn. 1 [25 Cal.Rptr.2d 137, 863 P.2d 207].) ■■■ However, Uhrich then waived the objections in this court by failing to head an argument in her brief attacking the trial court's ruling, and failing to provide legal analysis to demonstrate why the trial court's evidentiary rulings were in error. In two footnotes she asserts the trial court erred, but she does not amplify the assertion by citation to authority. In the text— which addresses only some of the statements—she asserts (also without citation to authority) that Uhrich's statements merely evidence *her* state of mind, and her belief about Lindseth's state of mind. These points are waived for lack of a heading or legal authority. (Cal. Rules of Court, rule 14(a)(1)(B); *Heavenly Valley v. El Dorado County Bd. of Equalization* (2000) 84 Cal.App.4th 1323, 1345, fn. 17 [101 Cal.Rptr.2d

591]; *People v. Harper* (2000) 82 Cal.App.4th 1413, 1419, fn. 4 [98 Cal.Rptr.2d 894].)

■ Moreover, the statements were more than Uhrich's *belief*; they were assertions intended to induce the court to grant a judgment in the underlying case (particularly to achieve punitive damages) and they achieved their intended effect. They were based on the evidence known to Uhrich and her counsel, not simply a subjective belief about Lindseth's motive. Further, they are not impermissible postdenial evidence, as Uhrich asserts. Uhrich cannot now "play fast and loose" with the judicial system. (*Schulze v. Schulze* (1953) 121 Cal.App.2d 75, 83 [262 P.2d 646].) She is bound by her judicial admissions. (*Kurinij v. Hanna & Morton* (1997) 55 Cal.App.4th 853, 870-871 [64 Cal.Rptr.2d 324].)

Uhrich's brief goes on to say that "assuming these statements shifted the burden" regarding Lindseth's motive, she met her burden. ■ But a judicial admission cannot be rebutted: It estops the maker. (*International Billing Services, Inc. v. Emigh* (2000) 84 Cal.App.4th 1175, 1190-1191 [101 Cal.Rptr.2d 532].) This principle is frequently applied in summary judgment proceedings. (See *Foxborough v. Van Atta* (1994) 26 Cal.App.4th 217, 222, fn. 3 [31 Cal.Rptr.2d 525]; 3 Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2001) ¶¶ 10:147 to 10:151, pp. 10-49 to 10-50.)

■ Uhrich's emphasis on Lindseth's evil intent in her quest for a judgment against him precludes her from characterizing his campaign and its component torts as merely negligent. We must accept that at the time State Farm declined coverage it properly concluded Uhrich's claims—however captioned in her complaint—arose out of Lindseth's malicious desire for vengeance against Uhrich and to preserve his psychology license.

### 2. *Other Evidence Known to State Farm*

State Farm had more to go on than Uhrich's admissions. It had statements by Lindseth, as well as declarations of coconspirators—introduced by Uhrich in aid of the underlying judgment. For example, Lindseth's counsel wrote to State Farm, conceding Lindseth hired the coconspirators "in an effort to 'set up' [Uhrich] to support his contention before the medical [*sic*] board that he had insufficient files because they had been stolen by [Uhrich]." Coconspirators Splawn and Johnson filed declarations "in support of [the underlying] judgment," drafted by Uhrich's counsel, which stated, without equivocation, "This action arises from [Lindseth's] deviant, criminal conspiracy . . . ." Based on their *personal knowledge*, the facts alleged in McVey's search warrant affidavit (for Lindseth's property) were true.

McVey's search warrant affidavit was tendered by Uhrich in support of the underlying judgment. It reflects that Lindseth asked the coconspirators to break into Uhrich's residence, to hire an investigator to find her new address, to surveil her new residence, to make a scripted statement to the authorities, and to take computer disks from Lindseth and state that they had found them at Uhrich's residence. When the plot began to unravel, Lindseth tried to break off contact and gave Splawn money to disappear.

State Farm also knew Lindseth pleaded guilty to conspiracy to pervert justice. ■■■ As Uhrich suggests, the conviction does not *necessarily* resolve the issue of intent. (*Allstate Ins. Co. v. Overton* (1984) 160 Cal.App.3d 843, 848-849 [206 Cal.Rptr. 823].) Not all of the torts alleged in the complaint were embraced by the overt acts supporting the conspiracy charge. Those overt acts were (1) preparing a script for Splawn and Johnson's false story, and (2) inducing Splawn to make a false statement under oath for Lindseth's use in the discipline case. Only acts embraced by the conviction are *necessarily* excluded from coverage. (*Horace Mann Ins. Co. v. Barbara B.* (1993) 4 Cal.4th 1076, 1083-1085 [17 Cal.Rptr.2d 210, 846 P.2d 792] (*Horace Mann*).) However, State Farm could consider the conviction in light of all other evidence at its disposal, in determining whether to continue providing a defense. (*Waller, supra,* 11 Cal.4th at p. 19.)

### 3. *State Farm Made Its Prima Facie Case*

■■■ The above undisputed facts, including the admissions regarding Lindseth's intent, demonstrate that Lindseth intended to harm Uhrich by his campaign against her. The policy provided coverage "for a loss," defined as "an accident" causing personal injury. Acting with intent to cause harm, followed by harm, is no accident. (*Flores, supra,* 45 Cal.App.4th 661, 669.) State Farm showed Uhrich could not prove an accident took place.

■■■ Further, a "wilful act" under section 533 includes acts intended to cause damage or done with knowledge that damage is highly probable. (*Downey, supra,* 66 Cal.App.4th at pp. 500-502; *Mez Industries, Inc. v. Pacific Nat. Ins. Co.* (1999) 76 Cal.App.4th 856, 876-877 [90 Cal.Rptr.2d 721] (*Mez*).) At the time State Farm withdrew coverage, it knew Lindseth's acts were wilful.

Therefore, the burden shifted to Uhrich to show some facts negating State Farm's evidence, thus raising a triable issue of fact on the coverage question. (Code Civ. Proc., § 437c, subd. (*o*)(2); *Aguilar, supra,* 25 Cal.4th at pp. 849, 853-855.)

### 4. *Uhrich's Claims Do Not Raise Any Triable Issues*

We must not paint with too wide a brush. In theory, in the course of his malicious campaign Lindseth also may have committed nonmalicious torts.

But where allegations are " 'inseparably intertwined' " with noncovered intentional conduct, there is no coverage. (*Jane D. v. Ordinary Mutual* (1995) 32 Cal.App.4th 643, 653 [38 Cal.Rptr.2d 131] ["obtaining information about plaintiff during counseling and using this information and misusing counseling techniques to create transference and to control and induce plaintiff's behavior" deemed " 'inseparably intertwined' " with sexual misconduct]; *Coit Drapery Cleaners, Inc. v. Sequoia Ins. Co.* (1993) 14 Cal.App.4th 1595, 1608 [18 Cal.Rptr.2d 692] [if during "course of inseparably intentional sexual molestation or harassment of the victim, the wrongdoer so negligently behaved as to cause the victim additional physical or emotional harm, there is no duty to defend" even if conduct might otherwise have been covered]. Cf. *Horace Mann, supra*, 4 Cal.4th 1076, 1085 [17 Cal.Rptr.2d 210, 846 P.2d 792].) We will consider the candidates for coverage raised in Uhrich's briefs. The only two for which she provides adequate argument and analysis are (1) defamation and (2) not completing the mediation session (NIED).

As for the rest, Uhrich asserts, without analyzing the legal theories underlying each of her claims (e.g., privacy, conversion, trespass, etc.), that the underlying judgment "establishes that Lindseth acted negligently or recklessly in causing several of the personal injuries [she] suffered." For lack of developed analysis, this general claim is waived. (*People v. Gidney* (1937) 10 Cal.2d 138, 142-143 [73 P.2d 1186]; *Diamond Springs Lime Co. v. American River Constructors* (1971) 16 Cal.App.3d 581, 608 [94 Cal.Rptr. 200].) Moreover, the judgment did not have the effect of proving Lindseth's intent was nonmalicious; indeed, the hefty award of punitive damages indicates the opposite. Further, the trial court's judgment does not, as Uhrich asserts, establish liability on "each and every" claim. Instead it awards damages for "tortious" conduct, as we explained in part III.D., *ante*. State Farm is only bound by "necessarily adjudicated" findings in the underlying judgment, not by the stipulations of the parties preceding the judgment. (See *Geddes & Smith, Inc. v. St. Paul Mercury Indemnity Co.* (1959) 51 Cal.2d 558, 561-562 [334 P.2d 881].)

### a. *The Defamation Claims*

The defamation claim alleged Lindseth charged Uhrich with a crime or dishonesty. "Said statements were communicated to multiple third parties, including [the coconspirators] and numerous representatives of the District Attorney, on numerous occasions . . . ." By cross-reference, the defamations were made "during pendency of" the license discipline case. The specific statements were that Uhrich "(1) had perjured herself in deposition testimony in [the first suit] (by denying taking patient files), (2) had stolen

the patient files and records, and (3) posed an immediate danger to the public through extortion of the patients."

Uhrich argues the way is open for her to show defamations unconnected to the criminal case. However, Uhrich did not establish the existence of such defamation claims during the summary judgment proceeding.

Apart from portions of Uhrich's opposition referencing the complaint and the underlying judgment, Uhrich points to her attorney's declaration in opposition to the motion. Wood's declaration states the defamation was "broader than the criminal prosecution," and listed a number of people to whom defamatory statements were made. He cited four pieces of evidence to support this assertion. None suffices.

The first three pieces of evidence show statements made *in the course of* Lindseth's vindictive campaign: The complaint alleged Lindseth defended his license by asserting Uhrich stole his files. A written meeting summary reflects that Lindseth told State Farm he told the police Uhrich took his files, and patients had reported blackmail attempts. All of the statements described were part of the criminal case (e.g., to McVey, the coconspirators or the police). A status letter to State Farm indicates Lindseth told *State Farm* Uhrich took his files, and told various government agencies she had done so; he also told the coconspirators the same story. None of these three pieces of evidence show defamation unrelated to Lindseth's vindictive campaign.

The fourth piece of evidence is described in Wood's declaration as a "verified pre-sentencing statement by Lindseth," which was attached as an exhibit to a summary judgment motion filed *by American*, "judicial notice of which is hereby requested." This document was not part of the request for judicial notice filed in connection with Uhrich's opposition. The request was buried in a pleading in violation of California Rules of Court, rule 342(c)(4) and therefore was not properly before the trial court, which apparently did not rule on the request. The document is not even in the record on appeal and we cannot consider it. (See Cal. Rules of Court, rule 14(a)(1)(C); *Lady v. Barrett* (1941) 43 Cal.App.2d 685, 686-687 [111 P.2d 702].)

Wood also asserted that his investigation revealed statements to various listed persons, most of whom are obviously connected to Lindseth's campaign of deceit (e.g., government officials, Lindseth's relatives and former patients). No *evidence* of these alleged statements was produced. A party cannot defeat summary judgment by the expedient of averring he or she has evidence to support a cause of action; instead, such evidence must be presented in opposition to summary judgment. (3 Weil & Brown, Cal.

Practice Guide: Civil Procedure Before Trial, *supra*, ¶¶ 10:198 to 10:205, pp. 10-64 to 10-65; see *Rochlis v. Walt Disney Co.* (1993) 19 Cal.App.4th 201, 219 [23 Cal.Rptr.2d 793]; *Hurley Construction Co. v. State Farm Fire & Casualty Co.* (1992) 10 Cal.App.4th 533, 538 [12 Cal.Rptr.2d 629] (*Hurley*).) The defamations shown *by the evidence* were embraced by Lindseth's campaign. Uhrich "cannot manufacture coverage from conjecture about potential claims concerning unspecified, yet hypothetically 'different,' defamations." (*Ringler Associates, Inc. v. Maryland Casualty Co.* (2000) 80 Cal.App.4th 1165, 1184-1185 [96 Cal.Rptr.2d 136].)

 Moreover, given that the complaint explicitly linked the defamation to Lindseth's campaign, we agree with State Farm that Uhrich's failure to amend the complaint to allege unconnected defamations is fatal to her theory of defamations unconnected to the conspiracy. (See *Leibert v. Transworld Systems, Inc.* (1995) 32 Cal.App.4th 1693, 1699 [39 Cal.Rptr.2d 65] [party seeking to rely on unpleaded claims must move to amend]; *Gunderson v. Fire Ins. Exchange* (1995) 37 Cal.App.4th 1106, 1114-1117 [44 Cal.Rptr.2d 272].)

To the extent Uhrich argues any defamations outside the overt acts in the conspiracy would support coverage, we disagree. State Farm showed that any defamations suggested by the evidence were an integral component of Lindseth's malicious scheme. Uhrich presented no evidence to the contrary. That some defamations may have been outside the ambit of the *criminal* case does not help Uhrich.

b. *Negligence Causing Emotional Distress (Walking Out of Mediation)*

Uhrich claims her NIED claim necessarily involves negligent conduct and therefore Lindseth's act of walking out of the mediation session triggered a duty to defend. This breach was pleaded as part of a malpractice claim and in the purported "cause of action" for NIED. But there is no "cause of action" for NIED. "[H]owever handy the acronym . . . there is no such thing as the independent tort of negligent infliction of emotional distress. . . . [¶] [I]t is more in keeping with the fact that NIED is not a separate doctrine to ask: What are the circumstances under which a plaintiff can recover damages for emotional distress as a matter of the *law of negligence*?" (*Lawson v. Management Activities, Inc.* (1999) 69 Cal.App.4th 652, 656-657 [81 Cal.Rptr.2d 745].)

 The complaint alleged Lindseth breached the settlement by bringing an attorney to the mediation (which was forbidden) and because he "appeared for a brief few seconds and then abruptly departed, refusing to participate . . . ."

While *some* cases labeled as contract breaches may raise coverable claims of an insurable loss (*Vandenberg v. Superior Court* (1999) 21 Cal.4th 815, 840-841 [88 Cal.Rptr.2d 366, 982 P.2d 229]), here we have a breach of contract operating under cover of a tort claim. Moreover, the breach was not accidental. As stated elsewhere, State Farm was entitled to consider the facts supporting the negligence claim. Otherwise, Uhrich could manufacture coverage by artful pleading. "Predicating coverage upon an injured party's choice of remedy or the form of action sought is not the law of this state." (*Id.* at p. 840; see *Horace Mann, supra,* 4 Cal.4th at p. 1086 [party may not relabel intentional conduct "as negligence in order to secure insurance coverage"].)

There is no suggestion in the evidence Lindseth accidentally brought his lawyer to the mediation or accidentally "appeared for a brief few seconds and then abruptly departed." Therefore, again Uhrich cannot show a covered accident took place. But she also characterizes Lindseth's conduct during the mediation (and otherwise) as a breach of his duty as a psychologist to prevent "countertransference" between professional and patient (or former patient). As we explain in a moment, any such professional negligence theory was barred.

### c. *The Policy Excluded Malpractice Coverage*

State Farm devotes most of its brief to the argument that its "business operations" exclusion is so broad it precludes any coverage on any theory asserted by Uhrich. We disagree. However, we agree that State Farm's "professional services" exclusion bars any malpractice claim.

### i. *The business operations exclusion*

In asserting its business operations exclusion bars all of Uhrich's claims, State Farm largely relies on a federal case which generally equates the exclusion with the more familiar "business pursuits" exclusion. (*State Farm Fire and Cas. Co. v. Geary* (N.D.Cal. 1987) 699 F.Supp. 756, 760-761 (*Geary*); see also *Reser v. State Farm Fire & Cas. Co.* (Tex.App. 1998) 981 S.W.2d 260 [using "pursuits," but not deciding scope of "operations"]; *Santos v. State Farm Mut. Auto. Ins. Co.* (Fla.Dist.Ct.App. 1998) 707 So.2d 1181 (*Santos*) [recognizing *Geary* did not resolve issue, but on the facts, conduct was "inextricably intertwined" with the business].) The typical business pursuits exclusion turns on a profit motive. (*State Farm Fire & Casualty Co. v. Drasin* (1984) 152 Cal.App.3d 864, 870 [199 Cal.Rptr. 749].) State Farm reasons that Lindseth's actions were designed to protect his license to practice psychology, and therefore because he had a profit motive,

coverage is excluded just as if the policy had used the "business pursuits" exclusion. We disagree.

Uhrich reasons that State Farm must have had some reason for using "business operations" instead of "business pursuits" and "business operations" implies acts forming a regular part of the conduct of the business; further, ambiguities should be read against the insurer. (E.g., *Reserve Ins. Co. v. Pisciotta* (1982) 30 Cal.3d 800, 808 [180 Cal.Rptr. 628, 640 P.2d 764]; *Merrill & Seeley, Inc. v. Admiral Ins. Co.* (1990) 225 Cal.App.3d 624, 630 [275 Cal.Rptr. 280].) We agree.

*Geary* did "not purport to define the outer limits of the business operations exclusion" because the court concluded the insured's conduct was "inextricably intertwined" with her employment such "that whatever the limitations [are] on the import of the phrase 'caused by your business operations,'" the exclusion applied. (*Geary, supra,* 699 F.Supp. at pp. 760-761.) The court then stated "despite the use of a different term, the plain meaning of 'business operations' strikes the court as remarkably like 'business pursuits.' There is no reason to give the word 'business' a different meaning in conjunction with the word 'operations' from that with the word 'pursuits.' Therefore, the court will define 'business' as activity engaged in for profit." (*Id.* at p. 761.)

The vice in *Geary* is it defines the phrase in the abstract rather "in the context of the instrument as a whole and in the circumstances of the case." (*Fibreboard Corp. v. Hartford Accident & Indemnity Co.* (1993) 16 Cal.App.4th 492, 509 [20 Cal.Rptr.2d 376].)

We agree with Uhrich that a reasonable insured could read State Farm's "business operations" exclusion more narrowly than a "business pursuits" exclusion. The New Hampshire Supreme Court has so held. (*Hoepp v. State Farm Ins. Co.* (1997) 142 N.H. 189, 191 [697 A.2d 943, 945]; and see *Santos, supra,* 707 So.2d at p. 1182 (dis. opn. of Blue, Acting C. J.) [fact question whether assault on coworker was part of "business operations"].)

ii. *The professional services exclusion*

 The subject policy excluded damages "caused by providing or failing to provide a professional service."

Uhrich explicitly characterized the settlement breach as *malpractice,* viz., failing "to give due respect to the therapy relationship by breaching the Settlement Agreement" as alleged. In a footnote, Uhrich states professional malpractice is a subject "which [State Farm's] policy admittedly does not cover," but purports to disavow this concession in the reply brief, asserting

that the long passage of time since Lindseth had given her psychological treatment rendered the professional services exclusion inapplicable to her claims.

In Uhrich's memorandum in support of a motion for summary adjudication, she asserted State Farm knew Lindseth negligently allowed the "phenomenon of transference and countertransference" to occur, which constituted malpractice. Further, State Farm knew "the conduct giving rise to" various counts, including NIED and defamation, "sprang from the phenomenon of transference and countertransference." Uhrich persisted in basing liability on "countertransference" in her memorandum opposing summary judgment, stating the complaint "alleges the other [non-defamation] personal injuries were caused not by motivation related to [Lindseth's] business pursuits, but because of the onset of countertransference." Uhrich contends that State Farm could not have relied on these postdenial statements, asserting in a footnote that the trial court should not have overruled her objections on this ground. However, these statements consist of judicial admissions about the contours of her claims. The complaint itself explicitly ascribes Lindseth's "harmful [mental] state" to his failure to prevent countertransference "[d]uring the course of treatment and continuing thereafter."

Uhrich contends the professional services exclusion is ambiguous and should be interpreted to cover injuries during "an on-going professional relationship." But she alleged ongoing duties were breached. The fact that Lindseth's campaign continued after severance of the professional relationship does not obviate the fact that her losses were "caused by providing or failing to provide a professional service."

### C. *No Separate Duty to Defend Exists*

 Relying on the general rule that a duty to defend is broader than the duty to indemnify (*Gray, supra,* 65 Cal.2d 263), Uhrich asserts State Farm owed Lindseth a duty to defend against her suit even if it owed no duty to indemnify him. We disagree.

Uhrich relies heavily on *Downey, supra,* 66 Cal.App.4th 478, which concluded that although a policy providing coverage for "malicious prosecution" could not provide for indemnity (because of § 533), it did provide a duty to defend.

Malicious prosecution eponymously embraces the element of malice. (*Sheldon Appel Co. v. Albert & Oliker* (1989) 47 Cal.3d 863, 871 [254

Cal.Rptr. 336, 765 P.2d 498]; *Downey, supra,* 66 Cal.App.4th at pp. 499, 503-506.) Uhrich asserts that, as in *Downey,* the policy here provided coverage for defense of intentional torts, such as defamation, therefore a duty to defend follows. Not so.

Assuming for the sake of argument that *Downey* was correctly decided, it does not apply in the circumstances of this case.

First, as we explained, unlike with malicious prosecution, a jury could find a person liable for assault, wrongful detention or defamation based on negligence. Therefore, the policy did not provide illusory coverage for these torts. (Cf. *Safeco Ins. Co. v. Robert S.* (2001) 26 Cal.4th 758, 762-766 [110 Cal.Rptr.2d 844, 28 P.3d 889].)

Second, and more importantly, *Downey* did no more than state the rule that the public policy embodied in section 533 does not preclude an insurance company from issuing a policy to protect against the expense of defending a lawsuit seeking damages based on intentional conduct. Contrary to Uhrich's view, *Downey* did not hold that any policy which offers coverage for a tort which may embrace an element of intentionality created a duty to defend. *Downey* flows from the rule that a duty to defend exists so long as an insured reasonably expects a defense for the claim, based on the policy language. (*Downey, supra,* 66 Cal.App.4th at pp. 508-509; see *B & E Convalescent Center v. State Compensation Ins. Fund* (1992) 8 Cal.App.4th 78, 93 [9 Cal.Rptr.2d 894] (*B & E Convalescent*); *Ohio Casualty Ins. Co. v. Hubbard* (1984) 162 Cal.App.3d 939, 947 [208 Cal.Rptr. 806].) *Downey* involved an exceptional situation where a defense to a necessarily intentional tort was offered. It did not and could not change the general rule that "where the extrinsic facts eliminate the potential for coverage, the insurer may decline to defend even when the bare allegations in the complaint suggest potential liability." (*Waller, supra,* 11 Cal.4th at p. 19.)

In *Downey* there was "a specific and express promise of both indemnity and defense coverage. . . . [¶] . . . [¶] '[I]f an insured either expressly purchases a defense without regard to indemnification . . . or is led by the terms of the insurance agreement . . . to reasonably expect a defense to the type of claim asserted, then a defense may be required even though there can legally be no duty to indemnify because of section 533.' " (*Downey, supra,* 66 Cal.App.4th at pp. 507-508; see *Melugin v. Zurich Canada* (1996) 50 Cal.App.4th 658, 663-665 [57 Cal.Rptr.2d 781].) *Downey* clarified: "Under settled principles of policy interpretation and construction the focus is upon the insured's *objectively* reasonable expectations. [Citations.] Thus, any ambiguity which may exist in policy language will be resolved in a manner

which is consistent with such expectations." (*Downey, supra,* 66 Cal.App.4th at p. 508, fn. 33.)

*Downey* distinguished other cases in part as follows: "[I]n each of those cases, the insured sought coverage under the general liability provisions relating to claims for alleged bodily injury. Coverage depended upon demonstrating the existence of an 'accident' arising out of a 'retail store hazard.' Unlike the case before us, there was no separate specific promise of a defense for the tort of malicious prosecution. . . . Here, there was a distinct promise to provide a defense and such express commitment certainly would create a reasonable expectation on the part of the Downey plaintiffs that a defense would be provided." (*Downey, supra,* 66 Cal.App.4th at p. 509, fn. omitted.)

Here, Uhrich must show an accident, unlike in *Downey,* where there was a separate promise to defend against an inherently intentional tort. Moreover, Lindseth could not hold an objectively reasonable belief that State Farm would defend him.

In *Coit Drapery Cleaners, Inc. v. Sequoia Ins. Co., supra,* 14 Cal.App.4th 1595 [18 Cal.Rptr.2d 692], the insured and managerial employees had been found liable for sexual harassment. (*Id.* at p. 1601.) The evidence showed the tortious conduct was "part of a consistent course of sexual harassment" and there were "no unresolved factual issues as to the intentionality" behind that conduct. (*Id.* at pp. 1602, 1608.) The court rejected a duty to defend because "we fail to see how any corporation could reasonably expect it would be defended against intentional misconduct claims . . . ." (*Id.* at p. 1607.)

 The "reasonable expectations" doctrine is triggered where a policy provision or exclusion is uncertain, in which case the inquiry turns to what a reasonable insured would expect. (*Gray, supra,* 65 Cal.2d at pp. 269-270; 2 Croskey & Kaufman, Cal. Practice Guide: Insurance Litigation (The Rutter Group 2001) ¶¶ 7:561 to 7:562, pp. 7B-18 to 7B-19.) Where no uncertainty exists, the insured cannot reasonably expect a defense. (Croskey, *supra,* at ¶ 7:563, p. 7B-19, citing *B & E Convalescent, supra,* 8 Cal.App.4th at pp. 99-100.) As indicated in *B & E Convalescent,* discussed by *Downey,* the question is whether Lindseth could reasonably expect that his policy provided a duty to defend. (*B & E Convalescent, supra,* 8 Cal.App.4th at pp. 99-102 [" ' "The obligation to defend is predicated upon liability for a loss covered by the policy." ' "].)

 Lindseth had no *reasonable* expectation that he could insulate himself from liability by relying on insurance to relieve him of the burden to defend a lawsuit predicated on his campaign against Uhrich. He acted with

malice and should have understood he was not generating any "loss" or accident within the terms of the policy. (*20th Century Ins. Co. v. Stewart* (1998) 63 Cal.App.4th 1333, 1338-1339 [74 Cal.Rptr.2d 492]; *Hurley, supra*, 10 Cal.App.4th at p. 539 ["Any insured who participates in a conspiracy to defraud . . . cannot reasonably expect insurance coverage based upon the intentionally created 'occurrence' "]; *Mez, supra*, 76 Cal.App.4th at pp. 869, 874-878.)

In her rehearing petition, reiterating a point made in a supplemental brief, Uhrich points to the absence of the word "loss" in the defense portion of Lindseth's policy and argues this means the duty to defend is not limited to accidents. But the promise was to defend claims "covered by this policy," which incorporates the coverage definitions provided elsewhere. There was no specific promise to defend noncovered intentional conduct in this policy.

## IV. CONCLUSION

Although the briefs are replete with arguments parsing the complaint and the policy, Uhrich cannot escape the fact that at the time State Farm withdrew its defense, it knew Lindseth's acts were not only intentional, but done with the purpose of causing harm. This is not a case where a party has bought a "litigation policy" or may reasonably expect a defense from a suit alleging inherently intentional torts. (Cf. *Downey, supra,* 66 Cal.App.4th at pp. 507-508.) This is an umbrella policy which promised to defend actions alleging losses caused by Lindseth's accidents. The underlying suit did not fall within the coverage bargain struck by Lindseth and State Farm. It would be a windfall for Lindseth (and his assignee, Uhrich) to construe the policy otherwise on the undisputed facts. The trial court properly granted summary judgment.

## DISPOSITION

The judgment is affirmed. Uhrich is to pay State Farm's costs of this appeal. (Cal. Rules of Court, rule 27(a).)

Sims, Acting P. J., and Nicholson, J., concurred.

A petition for a rehearing was denied July 9, 2003, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied September 24, 2003.